Rockingham
No. 6879

TIMBERLANE REGIONAL SCHOOL DISTRICT

v.

TIMBERLANE REGIONAL EDUCATION ASSOCIATION & a.

April 3, 1974

*Soule & Leslie (Mr. Lewis F. Soule* orally) for the plaintiff.

*McLane, Graf, Greene & Brown* and *Jack B. Middleton (Mr. Middleton* orally) for the defendant.

*Nighswander, Lord, Martin & KillKelley* and *Bradley F. Kidder*, by brief for New Hampshire School Boards Association as amicus curiae.

*Paul F. Cavanaugh,* city solicitor, by brief, for the city of Concord as amicus curiae.

KENISON, C.J. The major issue in this case is whether the presiding justice properly denied the plaintiff's petition to enjoin the defendants from engaging in or aiding and abetting a strike. The plaintiff filed the petition for injunction on February 28, 1974, and requested an immediate hearing. The Presiding Justice, *Morris,* J., assigned the case to Master *Leonard C. Hardwick,* Esquire, who, after several hearings and meetings on the petition, filed a report on March 11, 1974 recommending the petition be presently denied but remain on file to be brought forward on the motion of the court or of the parties. The presiding justice approved the master's report forthwith and issued a decree in accordance with the recommendation. On March 19, 1974, the plaintiff filed a motion to set aside the decree as against the law and the facts. This motion was denied by the court, subject to the plaintiff's exception, and was reserved and transferred. The following facts appear from the pleadings, reserved case, briefs and oral arguments.

The Timberlane Regional Education Association (hereinafter TREA) is the collective bargaining agent for some, if not all, of the teachers in the Timberlane Regional School District and is affiliated with the New Hampshire Education Association, whose membership consists of school teachers employed throughout the State. The TREA and the Timberlane Regional School Board (hereinafter board) agreed to meet during the spring and summer of 1973 for the purpose of negotiating a contract for the 1974-75 school year.

The board proceeded to hire a professional negotiator and delayed meeting with the TREA until July 31, 1973. The parties met throughout the fall and early winter and, by January 14, 1974, had reached a tentative agreement on approximately one-quarter of the items submitted for negotiation by the TREA. The majority of the remaining items, which included salary schedules, sick and emergency leave, teacher rights and responsibilities, teacher evaluation, academic freedom and grievance procedures, had been declared nonnegotiable by the board. It became apparent that an impasse was developing in regard to these items, and the members of the TREA voted to submit their differences with board to a mediator for resolution. The TREA contacted the Federal Mediation Service which agreed to undertake mediation if both parties so requested. The board, however, declined to accept this offer, and several other attempts to find a mutually agreeable mediator came to naught.

The parties resumed negotiations on February 15, 1974, and met again on February 18, 20 and 23. These meetings resulted in a tentative agreement on several of the remaining items, but their differences with respect to a great majority of these items were unresolved. During the course of negotiations on February 23, 1974, the TREA discovered for the first time that on February 16, 1974, the board had submitted salary proposals to the budget committee, despite the fact that an agreement had not been worked out between the parties on this matter. The board then stated at the end of this session that it would go no further and declined to negotiate on the evening of February 23, or at any time on February 24, and 25, 1974.

The members of the TREA met on February 25, 1974, and voted to call for mediation because of an impasse in negotiations and to refuse to teach until mediation began. Last minute efforts to achieve compromise between the positions of the parties came to no avail, and the strike commenced on February 26, 1974. Approximately two-thirds of the teaching staff in the district did not report to work, and pickets were set up in the vicinity of the schools. The board was

initially able to keep all of the schools in the district open by hiring substitute teachers, and student attendance did not drop appreciably. The board, however, was utlimately forced to shut down the Timberlane Regional High and Junior High Schools.

"[P]ublic employer collective bargaining is now an established fact at the federal level and in the majority of state and local governments. The transition from uniform disapproval to majority acceptance of public employer collective bargaining began in 1955, when New Hampshire adopted legislation [Laws 1955, 255:1 effective July 14, 1955, now RSA 31:3] authorizing town governments to engage in collective bargaining with public employee unions." Blais, *State Legislative Control over the Conditions of Public Employment: Defining the Scope of Collective Bargaining for State and Municipal Employees,* 26 Vand. L. Rev. 1, 2 (1973). Nevertheless, in most jurisdictions a strike by public employees is prohibited either by statute or by judicial decision. Annot., 37 A.L.R.3d 1147, §§ 2, 3 (1971, Supp. 1973). New Hampshire is no exception to this rule, for this court held in *Manchester v. Manchester Teachers Guild,* 100 N.H. 507, 510, 131 A.2d 59, 63 (1957), that such strikes are illegal under the common law of this State and characterized this prohibition as a matter of public policy solely within the province of the legislature. *See* N. Edwards, The Courts and the Public Schools 682 (1971).

We are aware of the general dissatisfaction with the effect of this prohibition on labor negotiations between government and public employees. *See, e.g.,* Anderson, *The Impact of Public Sector Bargaining,* 1973 Wis. L. Rev. 986, 1023-25 (1973); Burton & Krider, *The Role and Consequences of Strikes by Public Employees,* 79 Yale L.J. 418, 437-40 (1970); Edwards, *The Emerging Duty To Bargain in the Public Sector,* 71 Mich. L. Rev. 885, 891-93 (1973); Foegen, *A Qualified Right to Strike - in the Public Interest,* 18 Lab. L.J. 90, 98-99 (1967); Kheel, *Strikes and Public Employment,* 67 Mich. L. Rev. 931 (1969); Wellington & Winter, *Structuring Collective Bargaining in Public Employment,* 79 Yale L.J. 805, 822-25 (1970). In the private sector, the right to strike is viewed as in integral part of the collective bargaining process. Anderson, *Strikes and*

*Impasse Resolution in Public Employment,* 67 Mich. L. Rev. 943, 957 (1969). In the public sector, however, the denial of the right to strike has the effect of heavily weighing the collective bargaining process in favor of the government. Without legislation providing alternative methods for resolving impasses in negotiation, there is no ultimate sanction available to the public employees for compelling the good faith of the government, and as a consequence, the only recourse available to them, if they are being treated unfairly, is to terminate their employment or to engage in an illegal strike. Bernstein, *Alternatives to the Strike in Public Labor Relations,* 85 Harv. L. Rev. 459, 464-66 (1971); Lev, *Strikes by Government Employees: Problems and Solutions,* 57 A.B.A.J. 771 (1971); Note, *Striking a Balance in Bargaining with Public School Teachers,* 56 Iowa L. Rev. 598, 599-601 (1971); Note, *Teacher's Strikes - A New Militancy,* 43 Notre Dame Lawyer 367 (1968).

It is not a proper judicial function to make policy judgments as to the merits of providing public employees with the right to strike or of developing alternative processes such as compulsory mediation or arbitration to resolve government labor disputes. For an excellent discussion of such policy matters, *see* Anderson, *The Impact of Public Sector Bargaining,* 1973 Wis. L. Rev. 986 (1973); Wellington & Winter, *Structuring Collective Bargaining in Public Employment,* 79 Yale L.J. 805 (1970). This decision must be made the the legislature. RSA ch. 98-C (Supp. 1973) (prohibiting strikes by state employee organizations where an agreement has been entered into with the State providing mediation and arbitration procedures for impasse resolution); RSA ch. 105-B (Supp. 1973) (prohibiting strikes by police organizations, but providing mediation and arbitration procedures for impasse resolution); see N.H. House bill 889 (1973 session; vetoed) (prohibiting public employee strikes but requiring the employer to bargain in good faith and providing procedure for impasse resolution); *see, e.g.,* Alaska Stat. § 23.40.200 (1972) (granting right to strike to certain public employees, including teachers, if not detrimental to public health, safety and welfare); Hawaii Rev. Stat. § 89-12 (Supp. 1973) (authorizing strikes by public employees if there is no danger to public health and safety);

Pa. Stat. Ann. tit. 43, § 1101.1003 (Supp. 1973) (permitting strikes by public employees if collective bargaining process is exhausted and no clear or present danger to public health, safety and welfare); Vt. Stat. Ann. tit. 16 § 2010 (Supp. 1973) (allowing strikes by teachers unless clear and present danger to a sound program of school education). *See also* Alderfer, *Follow-up on the Pennsylvania Public School Strikes,* 25 Lab. L.J. 161 (1974); Note, *Teacher Negotiations in Illinois: Statutes and Proposed Reforms,* 1973 U. Ill. L.F. 307 (1973).

However, in the absence of legislation, the courts are necessarily compelled to consider the problems inherent in labor relations between the government and public employees when called upon to issue an injunction to prevent an illegal strike. The injunction is an extraordinary remedy which is only granted under circumstances where a plaintiff has no adequate remedy at law and is likely to suffer irreparable harm unless the conduct of the defendant is enjoined. The availability of injunctive relief is a matter within the sound discretion of the court exercised on a consideration of all the circumstances of each case and controlled by established principles of equity. *Varney v. Fletcher,* 106 N.H. 464, 467-68, 213 A.2d 905, 908 (1965); *Johnson v. Shaw,* 101 N.H. 182, 188-89, 137 A.2d 399, 403 (1957).

In view of the nature of this remedy, a growing number of jurisdictions have applied equitable principles to deny the government the use of an injunction against illegal strikes by teachers unless there is a showing of irreparable harm to the public. One of the first cases in formulating this new approach was *School Dist. for Holland v. Holland Education Association,* 380 Mich. 314, 157 N.W.2d 206 (1968), in which the Michigan Supreme Court indicated that the refusal of the government to bargain in good faith would be a factor of importance in the determination of whether or not to issue an injunction. *Id.* at 327, 157 N.W.2d at 211. This position was embraced by the Rhode Island Supreme Court in *School Committee of Westerly v. Westerly Teachers Association,* 299 A.2d 441, 445 (R.I. 1973), which held that an injunction would not issue "unless it clearly appears from specific facts . . . that irreparable harm will result . . . ." *See* C. Nolte, Law and the School Superintendent § 7.14 (2d ed. 1971).

We are persuaded by these recent developments that it would be detrimental to the smooth operation of the collective bargaining process to declare that an injunction should automatically issue where public teachers have gone on strike. Note, *Ohio Public Sector Labor Relations Law: A Time for Reevaluation and Reform*, 42 U. Cinn. L. Rev. 679, 702-07 (1973); *see* NEA Report on Strikes in 1972-73 School Year, 541 BNA Gov't Employ. Rel. Rep. D-1 thru D-3 (Feb. 11, 1974). The essence of the collective bargaining process is that the employer and the employees should work together in resolving problems relating to the employment. The courts should intervene in this process only where it is evident the parties are incapable of settling their disputes by negotiation or by alternative methods such as arbitration and mediation. *See Danville Bd. of School Directors v. Fifield,* 132 Vt. 271, 315 A.2d 473 (1974), reported in 547 BNA Govt Employ. Rel. Rep. B-1 (Mar. 25, 1974). Judicial interference at any earlier stage could make the courts "an unwitting third party at the bargaining table and a potential coercive force in the collective bargaining processes." *School Committee v. Westerly Teachers Ass'n,* 299 A.2d 441, 446 (R.I. 1973). Accordingly, it is our view that in deciding to withhold an injunction the trial court may properly consider among other factors whether recognized methods of settlement have failed, whether negotiations have been conducted in good faith, and whether the public health, safety and welfare will be substantially harmed if the strike is allowed to continue. *See Levitt v. Maynard,* 105 N.H. 447, 450, 202 A.2d 478, 480 (1964); Gosseen, *Labor Relations Law,* 1972/73 Annual Survey of American Law, 445, 460 n.108 (1973).

We have reviewed the master's report and the record and are satisfied that the trial court took these matters into account in denying the injunction for the present. We agree with the master's opinion that the parties had not yet exhausted the possibilities of finding compromise in the collective bargaining process at the time the injunction was refused.

*Plaintiff's exception overruled.*

All concurred.