Strafford
No. 6885

## CITY OF DOVER

v.

## INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 1312 *& a.*

July 19, 1974

482

*Douglas C. Gray,* by brief and orally, for the plaintiff.

*Shaines, Madrigan & McEachern (Mr. Robert A. Shaines* orally) for the defendants.

KENISON, C.J. The major issue in this case is whether the trial court erred in granting the plaintiff's petition to enjoin the defendants from engaging in a work "slow-down" to obtain better terms at the bargaining table. A temporary injunction was granted following an *ex parte* hearing on March 15, 1974, enjoining the defendant union and non-union members "from continuing to refuse to answer bell alarms and mutual aid calls." On March 20, 1974, an evidentiary hearing was held on the request of the defendants at which the Trial Court (*Flynn,* J.) made a finding of fact that the contract executed by the parties on December 28, 1967, was still in force and modified its order by adding the phrase "if requested." The defendants objected to the finding of fact and certain rulings of law, and the court reserved and transferred their exceptions thereto.

The record shows that on December 28, 1967, the parties agreed to a contract which stated in pertinent part that "there shall be no strikes, slow-downs, stoppage of work or any interference with the efficient management of the Fire Department." The contract specifically provided that it would remain "in full force and effect . . . from year to year unless terminated by either party." On November 18, 1971,

the Dover city manager, Mr. Donald Chick, was notified by letter that "The membership of the Union on November 15, 1971 rejected the contract in its present form" and retained Mr. Robert A. Shaines, Esquire, to represent them as bargaining agent in negotiations with the city for a new contract. On December 3, 1971, Mr. Shaines informed Mr. Chick by letter that as an interim measure the defendant local would be agreeable to signing the existing contract if its duration were modified to a month-to-month basis, and he indicated that the local would suggest terms for a new contract in the near future. On December 15, 1971, Mr. Chick replied that the wages of all city employees were being raised by two percent and that the council would not require the firemen to sign a contract to be eligible. In his view this development precluded the necessity of discussing the proposed interim contract.

Over the next year negotiations were conducted without producing a new contract. On December 20, 1972, Mr. Chick was notified by the defendant local that its members voted that they would "not respond to any so-called box alarm, station call, engineers call, or any other permanent men's call" while off-duty "until the matter of time and a half for overtime (call back of permanent men) has been resolved with the city of Dover." On December 21, 1972, the city and the local agreed that "all members of the Dover Fire Department be required to return to all working fires, snow emergencies, hurricanes, and national disasters" for which they would receive "time and one half based upon their hourly rate of pay."

The parties continued to negotiate, but were unable to mutually agree on a new contract. On March 13, 1974, an instruction was issued by Mr. Chick to all department heads that an eight percent cost of living bonus for 1974 would not apply to overtime pay. On the following day, the members of the Dover Fire Department notified the fire chief that they had unanimously voted "not to return for any bell alarms or mutual aid calls" until the "pay situation has been resolved." A "bell alarm" occurs when the fire department receives notice of a fire through a street box and gives no information as to the type of fire. A

"mutual aid call" refers to a request for assistance from a neighboring community. In response to the firemen's action, the city filed this petition for injunctive relief.

The first question raised by the defendants is whether the trial court erred in finding that the contract executed in 1967 was still effective. They argue in the main that the language of their November 18, 1971 letter explaining that the local had "rejected" the contract was sufficient to notify the city that it was no longer in force and contend that Mr. Chick's December 15, 1971 letter impliedly recognized this fact. We cannot accept these arguments for the following reason. While the term "rejected" clearly conveys the message that the terms of the contract were no longer acceptable to the local, it falls short of expressly stating that the contract was terminated. A notice of termination should be clear and unequivocal so that the parties to the contract know without question that their relations are no longer governed by its terms. *Mathews v. Bennett,* 20 N.H. 21, 26-27 (1849); 6 A. Corbin, Contracts § 1266 (1962, Supp. 1964). Mr. Chick testified that he had not interpreted the November 18, 1971 letter as terminating the existing contract, but rather as notifying the city that the firemen wanted to commence negotiations on a new contract. He also stated, and was corroborated by the present and the former fire chiefs, that the parties had conducted relations from 1971 to the present time on the assumption that the contract was still in force during the negotiation period. In our opinion such an assumption is not unwarranted in the context of this case. It is a common practice in labor negotiations to extend the existing contract until a new contract is formulated. Although such an extension is frequently a result of an express agreement (*See* Gov't Employ. Rel. Rep. Ref. File 85:101 (1973); 1 Union Contracts Arbitration, Lab. L. Rep. para. 59,540 (1970)), it may also arise impliedly from the conduct of the parties. There is ample evidence to support the trial court's determination that the duration of the contract was extended throughout the negotiation period, and we will not disturb its finding. *Neilsen v. Department of Empl. Security,* 113 N.H. 642, 312 A.2d 708 (1973); *Jamestown Mut. Ins. Co. v. Meehan,* 113 N.H. 639, 312 A.2d

689 (1973); *Eichel v. Payeur,* 107 N.H. 194, 196, 219 A.2d 287, 288 (1966).

The next question presented by the defendants is whether their refusal to respond to bell alarms and mutual aid calls during off-duty hours is a violation of the contract. In support of their argument that such a refusal is not a breach, they place particular reliance on the plaintiff's acknowledgement in the pleadings that it has been the standard practice and procedure of the firemen to "voluntarily" respond to a request to return for bell alarms and mutual aid calls. They also point out that the contract is silent as to their obligations during the off-duty hours. These contentions cannot be adopted. Notwithstanding the plaintiff's admission that the return of off-duty firemen was voluntary, there is considerable evidence in the record demonstrating that the firemen customarily responded to bell alarms and mutual aid calls when requested. In addition, the fire chiefs testified that they were able to limit their on-duty force to thirteen firemen in reliance on this expectation and stated that the fire department would be unable to protect the community effectively if it were deprived of this source of off-duty manpower. The failure of the contract to specify the off-duty responsibilities of the firemen is not fatal because the conduct of the parties and all surrounding circumstances may be drawn upon to reveal the parties' common understanding of matters not expressly covered by its terms. *American Fed. AFL-CIO v. Dover,* 109 N.H. 299, 301, 249 A.2d 681, 683 (1969); *Griswold v. Heat Corporation,* 108 N.H. 119, 123, 229 A.2d 183, 187 (1967); *Bogosian v. Fine,* 99 N.H. 340, 342, 111 A.2d 190, 192 (1955). The facts in this case leave no question that the parties have long recognized the fireman's duty to respond to bell alarms and mutual aid calls when requested. The local's refusal to so respond until "the pay situation has been resolved" is a clear breach of its agreement not to engage in "strikes, slow-down, stoppage of work or any interference with the efficient management of the Fire Department." *See* Restatement (Second) of Contracts § 266(a) (Tent. Draft No. 8, 1973).

The final question brought forward by the defendants

is whether the trial court's ruling that firemen as public employees are prohibited from striking is vitiated by our decision in *Timberlane Regional School District v. Timberlane Regional Education Association,* 114 N.H. 245, 317 A.2d 555 (1974). In that case, we held that although the common law of the State made strikes by public employees illegal, the courts would apply equitable principles to determine whether an injunction should lie against such a strike in the absence of any directive from the legislature. Smith, Edwards & Clark, Labor Relations Law in the Public Sector 658-69 (1974); *see* RSA chs. 98-C, 105-B (Supp. 1973). However, it is important to note that we indicated that courts should consider among other factors whether the public health, safety and welfare would be substantially harmed if the strike were allowed to continue. This consideration is of paramount importance with respect to public employees who perform vital functions within the community, and it is unlikely that any situation would arise wherein a court would permit firemen to curtail essential services without being enjoined. *Grandview v. Moore,* 481 S.W.2d 555, 557-58 (Mo. Ct. App. 1972); *Garavalia v. Stillwater,* 168 N.W.2d 336, 341 (Minn. 1969); *Rockford v. Local No. 413, I.A.F.,* 98 Ill. App. 2d 36, 240 N.E.2d 705, 707 (1968); Annot., 37 A.L.R.3d 1147, § 5 (1971); *see* Craft, *Fire Fighter Militancy and Wage Disparity,* 21 Lab. L.J. 794 (1970). Although the *Timberlane* decision had not been handed down at the time this case was heard below, the trial court expressed its concern that the communities served by the defendants would be endangered if the off-duty firemen were not compelled to respond in their customary fashion to bell alarms and mutual aid calls. Moreover, both the former and present fire chiefs stressed in their testimony that the most critical time in fighting a fire is the first minutes after combustion has occurred because the flames can be contained and controlled. In their opinion the absence of the off-duty firemen, who could arrive on the local scene faster than fire departments dispatched from neighboring communities, would severely cripple the ability of the Dover department to gain that important advantage. In our judgment, the trial

court's decision to grant the injunction was properly based on its concern for the public safety and welfare, and we believe there is sufficient evidence to sustain its order.

*Defendant's exceptions overruled.*

GRIMES, J., did not sit; the others concurred.