Strafford
No. 80-004

VIGITRON, INC.

v.

JAMES R. FERGUSON,
d/b/a ULTRA DESIGN SYSTEMS
AND
JAMES W. WEEDEN

September 17, 1980

*Orr & Reno P.A.*, of Concord (*Howard M. Moffett* orally), for the plaintiff.

*Burns, Bryant, Hinchey, Cox & Shea*, of Dover (*Robert P. Shea* orally), for the defendants.

BOIS, J. This is a bill in equity seeking an injunction, monetary damages, and an accounting arising out of an employment relationship between the plaintiff and the defendants. The plaintiff alleged that the defendants appropriated and disclosed trade secrets and breached their confidential employment relationship by designing and attempting to market a flame safeguard control device for industrial boiler systems which competed with the plaintiff's devices. The defendants filed an answer and counter-claim also seeking injunctive relief and monetary damages. Trial before a Master (*Charles T. Gallagher*, Esq.) resulted in a recommendation that an injunction issue against the defendants, and that judgment be entered for the plaintiff. The Trial Court (*Bean*, J.) approved the recommendation and reserved and transferrred the defendant's exceptions. We affirm.

The plaintiff, Vigitron, Inc., manufactures and sells a series of sophisticated electronic flame safety controls for industrial boiler systems, involving certain trade secrets and confidential proprietary information. Their products include the "9001", described by the master as "the basic control box"; the "9002", described as "a cheaper and less sophisticated control box"; and the "9003", a development project which the plaintiff claims was an attempt to design and produce a major new control to succeed the "9001", and which the defendants claim was a limited effort to redesign the "9002".

The defendant Ferguson is an engineer who came to work for the plaintiff in January 1978. He was assigned the task of supervising all of the "home-base" activities of Vigitron, including research and development. The defendant Weeden is an electronics engineer hired by Vigitron in March 1978 to develop new products and improve upon flame safeguard controls. He was promoted to chief engineer in June 1978.

Vigitron's "9003" project was aimed at developing a flame safeguard control box of an improved design. It was instituted by

a confidential memorandum from Vigitron's president, Mr. Leake, to Ferguson dated April 20, 1978. Leake told Ferguson not to tell Mr. Jackman, the chief engineer at the time, about the project. In response to the memorandum and instructions from Ferguson, Weeden worked on such a project at his home.

In May 1978, Ferguson and Weeden, without Leake's knowledge, formed a partnership, Ultra Design Systems, to design and market electronic systems. Ferguson thereafter resigned his position with Vigitron. By June 8, 1978, Weeden had drawn a preliminary schematic of what he called the "Ultra 100" control, a new flame safeguard control device. By the end of July, Weeden had a final schematic and working prototype of the Ultra 100. In the interim, he had been promoted to chief engineer at Vigitron.

On August 12, 1978, Weeden and Ferguson went to Toronto, Canada and demonstrated and attempted to sell the Ultra 100 to the Canadian distributor of Vigitron products. The distributor called Leake the following day and told him about the demonstration. Up to this time, Vigitron's president was unaware of the existence of, or Weeden's involvement in, the development of the so-called Ultra 100. On August 14, 1978, Leake called a meeting with Weeden and other employees to discuss the matter. This litigation ensued.

The first issue is whether the trial court erred in ruling that the Ultra 100 was the sole property of Vigitron. We find no error.

The defendants admit that Weeden was hired as a project engineer "to aid in the development of products," and that Weeden was asked to work on "improving the plaintiff's 9003 flame safeguard control (a rework or redesign of the 9002)." They argue, however, that the Ultra 100 is a completely new device, and not a rework of or improvement upon the 9002. This argument is premised on claims that the plaintiff had not requested that Weeden design a completely new control; that the Ultra 100 did not involve any trade secrets of Vigitron nor the testing methods or expertise used in Vigitron products; that the work performed in the development of the Ultra 100 was at Weeden's home, on his own time, and with use of minimal contacts with Vigitron; and that the Ultra 100 embodied new concepts and devices rather than mechanical details of principles originating from Vigitron products.

The respective rights and obligations concerning an invention conceived by the employee spring from the contract of employment. *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933). The product of one who is hired to invent,

accomplish a prescribed result, or aid in the development of products belongs to the employer in the absence of a written contract to assign. *See id.; National Development Co. v. Gray*, 316 Mass. 240, 248–50, 55 N.E.2d 783, 787–88 (1944); *Steranko v. Inforex, Inc.*, 5 Mass. App. Ct. 253, 269, 362 N.E.2d 222, 233 (1977). Weeden designed and built the Ultra 100 while he was Vigitron's chief engineer during a period in which he had been asked to design the 9003. There is ample evidence in the record to support a finding that the design criteria for the Ultra 100 and the 9003 project were substantially the same, and that the Ultra 100 would have been directly competitive with Vigitron's most successful product, the 9001. The master's ruling that the Ultra 100 was the rightful property of Vigitron is supported by the record and must stand. *See Hynes v. Whitehouse*, 120 N.H. 417, 415 A.2d 876 (1980); *Ballou v. Ballou*, 118 N.H. 463, 465–66, 387 A.2d 1169, 1170 (1978).

■■ The defendants assign error to the master's reliance, in his ruling that the Ultra 100 was the property of Vigitron, upon the fact that "if the defendants had not worked for the plaintiff and gained familiarity with flame safeguard controls, they would not have created the Ultra 100 device." That an employee's rendition of services in the course of his employment may have so enhanced his mechanical skill, scientific knowledge and inventive faculties as to enable him to develop and perfect an idea into a patentable article, does not in itself give the employer any exclusive rights to inventions of the employee made during the employment. *National Development Co. v. Gray*, 316 Mass. 240, 247, 55 N.E.2d 783, 786 (1944); *see United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933). "But a manufacturing corporation, which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so employed. . . ." *United States v. Dubilier Condenser Corp., supra* at 187–88. With regard to the master's ruling that the Ultra 100 was the property of Vigitron, his reliance upon the knowledge gained and skills developed by the defendants while employed at Vigitron was therefore error. We do not find such error to be reversible, however, in view of the sufficiency of other evidence in the record upon which the ruling can be upheld. *See Thayer v. Thayer*, 119 N.H. 871, 874, 409 A.2d 1326, 1328 (1979); *Moultonboro v. Bissonnette*, 105 N.H. 210, 213–14, 196 A.2d 703, 705–06 (1963).

■ The defendants assign as error the fact that the master did not consider the "shop right" rule in reaching his decision for the reason that "his decision was based upon other legal principles." They argue that even if this court should find that Vigitron has an interest in the Ultra 100, at most it would only be a "shop right"; that is, a nonexclusive irrevocable license to use the Ultra 100. *See generally* 53 AM. JUR. 2d *Master and Servant* § 116 (1970); *Annot.*, 61 A.L.R.2d 356 (1958). A precondition for the application of the "shop right" rule is that the employee not be hired for the purpose of developing the product in question. *See National Development Co. v. Gray*, 316 Mass. 240, 247, 55 N.E.2d 783, 787 (1944). Because the record supports the master's finding that the defendants were hired for the purpose of developing a product like the Ultra 100, the "shop right" issue was properly not considered by him and is therefore not before us on review.

The defendants next argue that the trial court erred in enjoining them from designing or manufacturing the internal circuitry of flame safeguard controls for a period of two years.

Ferguson was vice-president of Vigitron and had responsibility for running the plant while the president was away, supervising research and development, and among other things, ensuring plant security. Weeden was hired by Vigitron as an electronics engineer to aid in the development of new products, techniques and test equipment, and was later promoted to chief engineer. The record supports the master's findings that the defendants stood in a confidential relationship with the plaintiff and were given access to confidential information relating to Vigitron's flame safeguard control products.

While Ferguson and Weeden stood in a confidential relationship with Vigitron, they formed a partnership to design and sell products that would compete directly with Vigitron's basic line of flame safeguard controls, without the approval or knowledge of Vigitron's president. After Ferguson had resigned, but while Weeden was still employed at Vigitron, the defendants attempted to sell the Ultra 100 as a product of Ultra Design Systems to the Canadian distributor of Vigitron products. Even though the defendants may not have actually disclosed Vigitron trade secrets, the record supports a finding that the defendants breached their confidential relationship with Vigitron. RESTATEMENT (SECOND) OF AGENCY §§ 395, 396 (1958); *see DuPont Powder Co. v. Masland*, 244 U.S. 100 (1917); *Annot.*, 30 A.L.R.3d 631 (1970).

■■ Vigitron's right to injunctive relief here arises from the defendants' breach of confidential relationship, and not from any

use or disclosure of trade secrets. *See* 42 AM. JUR. 2d *Injunctions* §§ 31, 75 (1969). An employee may be enjoined from making use of information acquired in the course of the employment to the injury of the employer where such a breach occurs, even though there is no trade secret involved. H. MCCLINTOCK, EQUITY § 152 (2nd ed. 1948). A confidential relationship exists whenever confidence has been reposed and betrayed, and today the trend is toward liberalizing the term to prevent unjust enrichment. *Cornwell v. Cornwell*, 116 N.H. 205, 209, 356 A.2d 683, 686 (1976).

■ The availability of injunctive relief is a matter within the sound discretion of the court exercised upon consideration of all the circumstances of each case and controlled by established principles of equity. *Timberlane Regional School Dist. v. Timberlane Regional Educ. Ass'n*, 114 N.H. 245, 250, 317 A.2d 555, 558 (1974). In its determination, the court must balance all of the equities, including the relative hardship to the parties, their conduct with reference to the transaction, and the nature of the interests affected. H. MCCLINTOCK, EQUITY § 144 (2nd ed. 1948).

The master balanced the competing interests involved in this case:

> "On the one hand, the defendants have a right to use their expertise in the market place for their own profit and the law does not favor stifling competition. On the other hand, the plaintiff has proprietary rights in the Ultra 100 design and in the trade secrets embodied in its present devices which the defendants learned while they were employed by the plaintiff."

The master also took into consideration the fact that it was not known whether the Ultra 100 was a patentable device, the fact that other Vigitron flame safeguard devices cannot be protected by patents, and the fact that it would be "difficult, if not impossible, to enumerate all of the secrets and know-how acquired by them while they were employed by the plaintiff."

■ The law does not favor a stifling of competition. *See Laconia Clinic, Inc. v. Cullen*, 119 N.H. 804, 807, 408 A.2d 412, 414 (1979). Nor does the law favor the disclosure of trade secrets, however, or the use of confidential information by an employee to the detriment of his employer. H. MCCLINTOCK, EQUITY § 152 (2nd ed. 1948). We are not persuaded by the record that the court abused its discretion in enjoining the defendants from designing or manufacturing the internal circuitry of flame safeguard controls

for a period of two years. The injunction is for a limited time period; there was a reasonable probability that a real injury would occur if the injunction was not granted; and it would have been "difficult if not impossible" to enumerate all of the trade secrets and confidential information obtained by the defendants while employed by the plaintiff. *Cf., Head Ski Co. v. Kam Ski Co.*, 158 F. Supp. 919 (D.C. Md. 1958). Moreover, the injunction is narrowly drawn, and does not deprive the defendants of a livelihood. The defendants are not prohibited "from determining applications or application standards, features or specifications for flame safeguard controls, nor from designing burner management systems which incorporate as component parts such controls, so long as they do not become involved in the actual design or manufacture of the internal workings of the controls."

We note that the trial court enjoined the defendants from designing or manufacturing the internal circuitry of flame safeguard controls "in order to forestall the possibility of . . . use or disclosure [of trade secrets] in the future." This rationale was erroneous, as the mere possibility or fear of injury does not warrant injunctive relief. 42 AM. JUR. 2d *Injunctions* § 31 (1969). We do not find reversible error here, however, as the record demonstrates a reasonable probability that a real injury would occur if the injunction was not granted.

Accordingly, we uphold the injunction.

*Affirmed.*

All concurred.