Howtek v. Relisys                    CV-94-297-JD  07/12/96

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Howtek, Inc.

     v.                              Civil No. 94-297-JD

Relisys, et al.


O R D E R

The plaintiff, Howtek, Inc., brought this action against Teco Information Systems, U.S.A., Inc., Teco Electric & Machinery Co., Ltd., Relisys, Inc., and Herman Hsu (collectively "Teco") alleging, inter alia, breach of contract and misappropriation of trade secrets.  Before the court is Teco's motion for partial summary judgment (document no. 116).


Discussion[1]

Howtek, a Delaware corporation with its principal place of business in Hudson, New Hampshire, specializes in the design and marketing of computer supplies, including digital color scanners. In 1988, Howtek entered into a ten-year manufacturing agreement (the "1988 agreement") with Teco, a Taiwanese corporation, under which Teco was to manufacture Howtek's design for "Scanmaster III" color scanners.  The agreement required Howtek to purchase all of its requirements for Scanmaster III scanners for the first

_____

[1]The facts relevant to the instant dispute are either not in dispute or have been alleged by the plaintiff.

two years of the agreement, and not less than 50% of its requirements the two years thereafter.  1988 Agreement § 6.1. The agreement also granted Howtek the right to break its exclusivity arrangement with Teco in the event that its customers "require[d] manufacturing licenses as part of a quantity commitment in agreements with Howtek."  Id. § 6.2.  In such a case, the agreement required Howtek to notify Teco of the arrangement, and provided that the arrangement would only take effect if Teco were unable to manufacture sufficient quantities of scanners to satisfy the demands of Howtek's customers.  Id.

The 1988 agreement expressly prohibited Teco and its subsidiaries and affiliates from using the technology and information that Howtek furnished to Teco without Howtek's authorization, id. § 13.1, and from developing digital scanners during the term of the agreement and for one year thereafter, id. § 14.2.  The agreement also contained a provision wherein Teco acknowledged that it had not manufactured digital color scanners comparable to the Scanmaster III, id. § 14.1(a), and, with the exception of a disclosure contained in an exhibit attached to the agreement, had neither the plans nor the know-how to manufacture a comparable scanner without the disclosure of Howtek's technology.  Id. § 14.1(b).  In addition, the agreement provided:

2

Teco acknowledges that the Confidential Information[2] of

_____

[2]The 1988 agreement defined "Confidential Information" as

all Technical Information except Technical Information
which:
    (i) has been specifically set forth and presently
claimed in "Patents" (as hereinafter defined) issued or
in "Patent Applications" (as hereinafter defined)
published in any jurisdiction; or
    (ii) was or is known to both parties hereto at the
time of the disclosure thereof by one party hereto to
the other party hereto; or
    (iii) was or is known to the public or generally
available to the public at the time of the disclosure
thereof by one party hereto to the other party hereto;
or
    (iv) became or becomes known to the public or
generally available to the public (other than by an act
of Teco or Howtek or their employees) subsequent to the
disclosure thereof by one party hereto to the other
party hereto; or
    (v) corresponds in substance to ideas or technical
know-how disclosed or made available to one party
hereto by the other party hereto at any time by a third
party having a bona fide right to disclose or make
available said ideas or technical know-how to such
party hereto.
1988 Agreement § 1(i).

The agreement defined "Howtek Technical Information" as

Howtek Technology, Developments, Improvements and all
other technical data, designs, engineering, hardware
and computer software products, and other valuable
know-how and trade secrets relating or pertaining to
Scanmaster III, and succeeding scanner products
including film scanners, Pre-Production Machines,
Production Machines, and other trade secret
data/technology of Howtek, including all ideas,
technical know-how, information and data, components,
technical descriptions, tooling designs, assembly tool
designs, drawings, models, materials specifications,
purchase component sources, conformity tolerances,
assembly tolerances, expertise, know-how and other

3

Howtek disclosed to Teco by Howtek constitutes valuable trade secrets and proprietary information owned by Howtek. Teco agrees to safeguard at all times the Confidential Information of Howtek and to prevent the unauthorized use, reproduction, disclosure or other dissemination of any Confidential Information of Howtek except as expressly authorized for the purposes set forth in this Agreement.

Id. § 13.1.

The 1988 agreement also contained a merger clause, whereby the parties agreed that

[t]his Agreement sets forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and merges all prior negotiations between them, there are no oral representations or inducements pertaining thereto which are not contained herein, and neither of the parties hereto shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the date hereof in writing and signed by a proper and duly authorized officer or representative of the party hereto to be bound hereby.

Id. § 21.6.

In late 1989, Howtek and Teco began discussions concerning the manufacture of scanner products at the lower end of the scanner market. During these discussions, Howtek informed Teco that it was crucial that a Macintosh-compatible version of the planned scanner be available by late 1990. Teco represented that it could deliver the scanners within this timetable and, in reliance on these representations, Howtek entered into a second

---

information.
Id. § 1(h).

4

manufacturing agreement with Teco (the "1990 agreement"). The 1990 agreement incorporated by reference the terms of the 1988 agreement, and provided in pertinent part:

> 1. Teco agrees to manufacture and sell and Howtek agrees to purchase a digital color scanner described in the Specifications in Exhibit A and referred to herein as the Personal Color Scanner.
>
> 2. The purchase price of the Personal Color Scanner is U.S. $500 F.O.B. seaport/airport Taiwan, Payment is net 30 days from shipment.
>
> 3. The Personal Color Scanner shall comply with and operate in accordance with the Specifications.
>
> . . . .
>
> 5. Howtek shall have exclusive worldwide marketing rights to the Personal Color Scanner and any subsequent color scanner product manufactured by Teco which Howtek intends to market. Provided Teco can deliver to Howtek a minimum of 400 Personal Color Scanner's [sic] in the third calendar quarter of 1990 and 1000 Personal Color Scanner's [sic] in the fourth calendar quarter of 1990, then in the event Howtek fails to purchase 2,500 Personal Color Scanner's [sic] by June 30, 1991 (consisting of 1000 Personal Color Scanner's [sic] in the first quarter of 1991 and 1500 Personal Color Scanner's [sic] in the second quarter of 1991), Teco shall meet with Howtek, and review Howtek's marketing program. If, after such review of Howtek's marketing plans, Teco desires to pursue a different distribution strategy, then Howtek's rights to the Personal Color Scanner shall become non-exclusive.

In late 1990, Teco revised the projected delivery date for the Macintosh-compatible scanner, promising that it would be ready for production no later than the end of March 1991. However, Teco failed to deliver the scanner as had been agreed and, beginning in early 1992, began to manufacture and sell

5

scanners and scanner components to third parties using technological and marketing information gained from its relationship with Howtek.

In June 1994, Howtek filed the instant lawsuit, alleging that: Teco[3] breached the 1990 manufacturing agreement by failing to deliver the Macintosh-compatible scanners in a timely manner (count I); Teco misappropriated trade secrets in violation of N.H. Rev. Stat. Ann. ("RSA") § 350-B (count II); the Teco defendants conspired to misappropriate Howtek's trade secrets (count III); Teco breached the 1990 agreement by designing, manufacturing, and selling scanners and scanner equipment without Howtek's authorization (count IV); Teco breached the 1988 agreement by selling scanners to third parties (count V); Teco engaged in common-law misappropriation and unfair competition (count VI); and Teco failed to pay for certain scanners that it promised it would buy back from Howtek (count VII).

---

[3]The court notes that Howtek has asserted each of its claims against different combinations of the Teco defendants. For convenience, and unless otherwise noted, the court refers to the defendants simply as "Teco."

## Discussion

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st Cir. 1992), cert. denied, 113 S. Ct. 1845 (1993)), cert. denied, 115 S. Ct. 56 (1994). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light most favorable to the plaintiff, "`indulging all reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)), cert. denied, 504 U.S. 985 (1992). However, once the defendant has submitted a properly supported motion for

7

summary judgment, the plaintiff "may not rest upon mere allegation or denials of his [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

I.  Count I -- Breach of the 1990 Agreement

A.  Statute of Limitations

Teco argues that summary judgment is warranted on count I of Howtek's claim because the claim is barred by the three-year statute of limitations for contract actions under RSA § 508:4. Howtek contends that its action is timely because its claim is governed by the Uniform Commercial Code's four-year statute of limitations.

The court's inquiry into the timeliness of Howtek's action requires a determination of whether the 1990 agreement is governed by Article 2 of the New Hampshire version of the Uniform Commercial Code ("UCC").  Article 2 of the UCC applies to "transactions in goods."  RSA § 382-A:2-102 (1994).  Because the term "goods" includes specially manufactured goods, RSA § 382-A:2-105(1) (1994), "[t]he fact that the seller makes the goods according to the buyer's specifications does not remove the contract from the classification of a contract for the sale of

goods."  1 Ronald A. Anderson, Uniform Commercial Code § 2-105:42 (3d. ed. 1981).  In addition, the fact that goods are not in existence at the time of contracting does not remove them from the ambit of Article 2.  See RSA § 382-A:2-105(2) (1994) & off. cmt. 2 (contract for sale of goods applies to sale of "future" goods).

The 1990 agreement was a contract for the manufacture and sale of digital color scanners according to specifications agreed upon by the parties.  Although the agreement necessarily required Teco to provide both goods and services to Howtek, Article 2's unqualified statement that the term "goods" includes "specially manufactured goods" makes it "unnecessary to determine whether the service aspect of the transaction is dominant or merely incidental."  Id.  The court finds that the 1990 agreement is governed by the UCC and its four-year statute of limitations. See RSA § 382-A:2-725 (1994).  Accordingly, the plaintiff's claim is not time-barred.


B.  Terms and Enforceability of the 1990 Agreement

Teco next argues that summary judgment is warranted on count I because the 1990 agreement did not obligate Teco to provide a Macintosh-compatible scanner at all, let alone by a particular date.  It further claims that the 1990 agreement is unenforceable

9

under the UCC because it is barred by the statute of frauds. Howtek claims that the parties' negotiations and conduct after the agreement was signed reflects the parties' agreement on a specific timetable for the delivery of Macintosh-compatible scanners under the 1990 agreement, and that the 1990 agreement is itself sufficient to satisfy the UCC's statute of frauds.

RSA § 382-A:201 (1994) provides that

a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

The official comment to this provision emphasizes that the writing need not contain or precisely state every material term of the contract. Rather, "[a]ll that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." Id. off. cmt. 1. An exclusive requirements contract satisfies the UCC's statute of frauds even if the contract contains no specific quantity term. See Advent Sys., Ltd. v. Unisys Corp., 925 F.2d 670, 678 (3rd Cir. 1991) (citing Gestetner Corp. v. Case Equip. Co., 815 F.2d 806, 811 (1st Cir. 1987)).

Here, neither the 1990 agreement nor the 1988 agreement

expressly mentions the manufacture of Macintosh-compatible scanners. However, Howtek has submitted evidence that the parties reached an oral understanding in early 1990 that a Macintosh-compatible scanner "was a key product, the development of which was to be finished by the end of 1990." Affidavit of Michael Varanka ¶ 10. Howtek also has provided copies of documents prepared by Teco and correspondence between Teco and Howtek reflecting the parties' understanding that Teco would furnish Macintosh-compatible scanners by late 1990 or early 1991. See, e.g., id. Ex. C, Letter from Grant Lee to Mike Varanka, December 20, 1990 (suggesting that production of Macintosh-compatible scanners had not changed and would be "control[led] strictly"); id. Ex. D (production schedules for Macintosh-compatible scanners prepared by Teco). The court finds this evidence sufficient to establish a genuine issue of material fact concerning Teco's agreement to provide Macintosh-compatible scanners for Howtek.[4]

---

[4]Relying on the provision in the 1988 agreement that requires all modifications to be in writing and to be signed by an authorized representative of the party agreeing to be bound, Teco also argues that any agreement to produce Macintosh-compatible scanners is unenforceable. See RSA § 382-A:2-209(2) (1994). However, as noted in the text, Teco has produced several documents signed by Teco representatives indicating Teco's understanding that it would manufacture Macintosh-compatible scanners for Howtek, and thus has established a genuine issue of material fact concerning the satisfaction of the contractual provision at issue.

11

The court also finds Teco's statute of frauds claim unavailing. As noted above, a writing is sufficient to satisfy the statute of frauds even if it omits certain material terms. Thus, the fact that the 1988 Agreement does not mention Macintosh compatibility does not render it unenforceable. As Teco does not dispute the existence of a writing signed by Teco evidencing a sale agreement and, in fact, has admitted its existence in count II of its counterclaim, see § RSA 382-A:2-201(3)(b), the only relevant question is whether the exclusivity arrangement between the parties satisfies the requirement of a quantity term.

Teco claims that the agreement is not enforceable as a requirements contract because it did not obligate Howtek to buy 100% of its requirements from Teco after the first two years of the agreement, and because the agreement authorized Howtek to purchase scanners from customers to whom it granted manufacturing licenses. However, even if the 1988 agreement were unenforceable for lack of a sufficient quantity term after two years, it is undisputed that 1990 agreement was breached during the first two years of the agreement, at which time Howtek was obligated to purchase 100% of its scanners from Teco. In addition, Teco has ignored the provision of the 1988 agreement requiring Howtek to offer Teco a chance to satisfy the needs of any of Howtek's customers who demanded manufacturing licenses as part of their

12

agreements with Howtek.  Although this arrangement permitted Teco to opt out of the exclusivity arrangement if it was unable to meet the demands of Howtek's customers, it did not undermine the agreement's basic status as a requirements contract.  The court finds that the exclusivity arrangement of the 1990 agreement satisfies the quantity requirement of the UCC's statute of frauds.

Teco's motion for summary judgment on count one is denied.


II.  <u>Count II -- Misappropriation of Trade Secrets</u>

Teco argues that summary judgment is warranted on count II because Howtek failed to identify during discovery the trade secrets that Teco misappropriated or how they were misappropriated.  Howtek responds by arguing that Teco's remedy lies in a motion to compel further discovery.  Howtek also notes that the manufacturing agreements expressly state that the confidential information Howtek transferred to Teco constituted valuable trade secrets, and relies on the totality of the information provided to Teco during the parties' relationship to support its claim of misappropriation.  Finally, Howtek has submitted a laundry list of purported trade secrets, including an affidavit from its Senior Vice President for Technology indicating that beginning in 1993 Teco engaged in the product

13

development plan that Howtek supplied to Teco pursuant to the manufacturing agreements between the parties.

Considering Teco's acknowledgement in the manufacturing agreements that the confidential information provided by Howtek constituted trade secrets, the court finds that the evidence Howtek has proffered in opposition to Teco's motion for summary judgment is sufficiently specific to sustain Howtek's claim under RSA § 350-B and to create genuine issues of material fact concerning Teco's alleged misappropriation of trade secrets. To the extent Teco's motion seeks relief for failure to comply with certain interrogatories and discovery orders, its remedy lies in a motion for further discovery or for sanctions under Rule 37, and not in a motion for summary judgment under Rule 56. See United States v. One 1987 BMW 325, 985 F.2d 655, 660 (1st Cir. 1993); Batson v. Neal Spelce Assocs., 765 F.2d 511, 516 (5th Cir. 1985) (in considering motion for dismissal under Rule 37, district court should first consider sanctions less drastic than dismissal). Teco's motion for summary judgment on count II is denied.

III. Count VI -- Common-Law Misappropriation

Teco seeks summary judgment on Howtek's common-law misappropriation claim on the ground that such a claim is

14

preempted by the New Hampshire Uniform Trade Secrets Act, RSA §

350-B (1995). Howtek argues that its complaint alleges misuse

not only of Howtek's trade secrets, but also of "confidential

information," and that the Uniform Trade Secrets Act does not bar

the claim to the extent it seeks relief for misappropriation of

confidential information.

> The Uniform Trade Secrets Act provides: I. Except as
> provided in paragraph II, this chapter displaces conflicting
> tort, restitutionary, and other law of this state providing civil
> remedies for misappropriation of a trade secret.
>
> > II. This chapter does not affect:
> > (a) Contractual remedies, whether or not based upon
> > misappropriation of a trade secret;
> > (b) Other civil remedies that are not based upon
> > misappropriation of a trade secret; or
> > (c) Criminal remedies, whether or not based upon
> > misappropriation of a trade secret.

RSA § 350-B:7 (1995). In Vigitron, Inc. v. Ferguson, 120 N.H.

626, 419 A.2d. 1115 (1980), decided prior to New Hampshire's

enactment of the Uniform Trade Secrets Act, the New Hampshire

Supreme Court recognized a right of action based on an employee's

breach of a confidential relationship with his employer, even

absent the employer's disclosure of a trade secret. The court

stated:

> [The plaintiff's] right to injunctive relief here
> arises from the defendant's breach of [a] confidential
> relationship, and not from any use or disclosure of a
> trade secret. . . . An employee may be enjoined from
> making use of information acquired in the course of the

15

employment to the injury of the employer where such a breach occurs, even though there is no trade secret involved. . . . A confidential relationship exists whenever confidence has been reposed and betrayed, and today the trend is toward liberalizing the term to prevent unjust enrichment.

Id. at 631-32, 419 A.2d at 1119; cf. Petition of Contoocook Valley Paper Co., 129 N.H. 528, 534, 529 A.2d 1388, 1392 (1987) ("[A] former agent cannot use confidential information obtained during the course of a fiduciary relationship.").

To the extent Howtek seeks relief in count VI for Teco's misuse of confidential information, as opposed to trade secrets, the court finds that this cause of action is not based on "misappropriation of a trade secret" and thus is not barred by RSA § 350-B:7. Accord Boeing Co. v. Sierracin Corp., 738 P.2d 665, 673 (1987). But see Composite Marine Propellers v. Van Der Woude, 962 F.2d 1263, 1265 (7th Cir. 1992) (applying Illinois law) (trade secret act abolishes fiduciary liability based on misuse of secret information).[5] Accordingly, Teco's motion for

---

[5]The parties have not addressed and the court does not consider the question of whether Teco owed a fiduciary duty to Howtek under New Hampshire law. Compare Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1330 (5th Cir.) ("As a matter of Louisiana law, a contract, standing alone, does not impose any fiduciary duties upon the parties . . . ."), cert. denied, 115 S. Ct. 71 (1994) with Lash v. Cheshire County Sav. Bank, 124 N.H. 435, 438, 474 A.2d 980, 981 (1984) (fiduciary relationship "exists wherever influence has been acquired and abused or confidence has been reposed or betrayed") (quotation marks omitted).

16

summary judgment on Howtek's common-law misappropriation claim is denied.

IV. Count III -- Civil Conspiracy

Teco contends that summary judgment is warranted on count III because Teco cannot sustain its underlying misappropriation claim, and because Howtek has failed to provide specific facts to support its charge that the Teco defendants conspired to misappropriate Howtek's trade secrets and confidential information.

As the court's findings in parts II and III, supra, dispel Teco's first argument, the court proceeds to Teco's claim concerning the specificity of Howtek's claim of civil conspiracy. Teco correctly notes that "allegations of conspiracy must . . . be supported by material facts, not merely conclusory statements," Slotnick v. Garfinkle, 632 F.2d 163, 165 (1980); cf. Fed. R. Civ. P. 9(b), and confines most of its attacks on the sufficiency of Howtek's allegations of conspiracy to Howtek's complaint. However, Teco's claim of lack of specificity comes to the court in the context of a motion for summary judgment filed near the close of an extensive and hotly contested discovery process. As such, the court considers Teco's claim in light of the entire record, and finds that Howtek's claims of conspiracy

17

are sufficient to withstand Teco's belated attack. Howtek's complaint and the course of discovery indicates that Howtek's conspiracy claim is based on an agreement reached in 1991 whereby Herman Hsu and representatives of the corporate defendants decided to use, and did in fact use, information provided by Howtek to manufacture and market their own line of color scanners. Teco's motion for summary judgment on count III is denied.

V. <u>Count IV -- Breach of the 1988 Agreement</u>
   <u>Count V -- Breach of the 1990 Agreement</u>

Teco seeks summary judgment on counts IV and V on the ground that Howtek has failed to provide any proof of profits it lost as a result of Teco's breaches of the exclusivity and confidentiality provisions of the 1988 and 1990 agreements. Howtek claims that the expert report furnished by Dr. John Zarwan is itself evidence of the profits Howtek lost as a result of these breaches, and further claims that it is entitled under the 1988 agreement to an accounting of Teco's profits from Teco's venture into the scanner market.[6]

---

[6]Section 16.2(b) of the 1988 agreement provides that in the event of a breach by either party to the agreement, the other party may seek, <u>inter alia</u>, "an accounting of all profits realized by the party hereto in breach of this Agreement as a result of acts or omissions of the party hereto in breach of this Agreement."

18

A. The Zarwan Report

Borrowing language from the Zarwan report, Howtek argues that

> Dr. Zarwan opines that Howtek sustained a loss of profits due to the fact that the defendants were "contractually obligated to give Howtek the opportunity to sell" various products which the defendants then sold to third parties, that the defendant "ultimately developed [the product that Howtek wanted] but sold them on their own" and that this breach "prevented Howtek from participating in the explosive growth of this market."

The argument is unavailing. The first paragraph of the Zarwan report states that the report "was prepared by State Street Consultants, Inc. for Howtek, Inc. to address the loss of market share and associated loss of revenue resulting from the failure of Howtek's vendor to supply certain products." The report does not purport to calculate lost profits flowing from Howtek's breach of the exclusivity or confidentiality provisions of the 1988 or 1990 agreements, a conclusion confirmed by Zarwan's own deposition testimony. The court also notes that the quotations Howtek provides from the Zarwan report are taken out of context, and do not illustrate any causal link between the breach of the confidentiality and exclusivity provisions and Howtek's lost profits. Two of the three passages that Howtek has quoted come from the following portion of the Zarwan report:

<u>Howtek Product Plan 1990</u>
-In technology-driven markets, product leadership is
transient
-Feature-laden products quickly surpassed
-Virtually impossible to keep ahead without aggressive
product development and replacement
-Failure to deliver appropriate A4 products <u>prevented
Howtek from participating in the explosive growth of
this market</u>.
     -TECO <u>ultimately developed these products but sold them
     on their own</u>, evidently without giving Howtek the
     opportunity to do so.
(emphasis added).

The third passage appears on the next page:

<u>Market Share Projection: Assumptions</u>
-[Macintosh-compatible version of scanner] due Q1:91.
-<u>TECO contractually obligated to give Howtek the opportunity
to sell this product</u>.
(emphasis added).

These statements do not indicate that Teco's breach of the
confidentiality or exclusivity provisions caused Howtek any
damage. Rather, they suggest that Teco's failure to deliver a
single product in a timely manner prevented Howtek from
maintaining its position as a "player" in a rapidly expanding
market. The court finds that the Zarwan report is insufficient
to prove the profits Howtek claims to have lost from Teco's
breach of the exclusivity and confidentiality provisions of the
1988 and 1990 agreements.

20

B.  Howtek's Right to an Accounting

Teco next claims that the provision of the manufacturing agreement calling for an accounting of the breaching party's profits is unenforceable because it constitutes a penalty, rather than a means of estimating lost profits.  The court finds the argument unconvincing.  Although a liquidated damage award that is disproportionate to the actual injury is not enforceable, such a provision will be enforceable if it "is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy."  RSA § 382-A:2-718 (1994); see also Restatement (Second) of Contracts § 356(1) (1981).  In light of the apparent centrality of the exclusivity and confidentiality provisions to the manufacturing agreements and the difficulty of calculating the loss flowing from Teco's alleged breaches thereof, the court cannot conclude on the basis of the record before it that an accounting would be an unreasonable method of calculating damages.[7]

In sum, the court finds that Howtek has provided Teco with a sufficiently specific measure of damages resulting from Teco's

---

[7]By analogy, the court notes that "in lieu of damages measured by any other methods," the New Hampshire Uniform Trade Secrets Act expressly provides for the "imposition of liability for a reasonable royalty" as a remedy for the misappropriation of a trade secret.  RSA § 350-B:3(I) (1995).

21

alleged breach of the exclusivity and confidentiality provisions of the 1988 and 1990 agreements.  Accordingly, Teco's motion for summary judgment on counts IV and V is denied.

## Conclusion

Teco's motion for summary judgment (document no. 116) is denied on all counts.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

July 12, 1996

cc:   Steven E. Grill, Esquire
      Richard V. Wiebusch, Esquire
      Nigel Nien-Tsu Li, Esquire