NCNB NATIONAL BANK OF NORTH CAROLINA, Plaintiff,

v.

BRIDGEWATER STEAM POWER COMPANY; G2S Bridgewater, Inc.; Treebrook, Inc.; PJC, Inc.; and Paul J. Cavicchi, Defendants.

No. C–C–87–302–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

June 25, 1990.

George V. Hanna, III, Kenneth P. McNeely, Moore & Van Allen, Charlotte, N.C., for plaintiff.

Thomas D. Garlitz, Cansler & Lockhart, P.A., Charlotte, N.C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER was tried before the undersigned, sitting without a jury, on January 22, 23, and 24, 1990. The Plaintiff is seeking to recover a fee for allegedly acting as a financial advisor to the Defendants. In this Memorandum of Decision and Order, the Court will set forth its Findings of Fact and Conclusions of Law based upon the evidence introduced at trial, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

At trial, Attorneys George V. Hanna, III and Kenneth P. McNeely represented the Plaintiff. Attorney Thomas D. Garlitz represented the Defendants.

## I. FINDINGS OF FACT

### A. The Parties and Jurisdictional Facts

1. The Plaintiff, NCNB National Bank of North Carolina (hereafter "NCNB"), is a national banking association organized under the laws of the United States with its principal office and place of business in Charlotte, North Carolina. (Complaint Paragraph (hereafter "Para.") 1; Answer Para. 1).

2. Defendant Bridgewater Steam Power Company (hereafter "Bridgewater Steam") was a general partnership comprised of three partners: Defendant G2S Bridgewater, Inc. (hereafter "G2S Bridgewater"), Defendant Treebrook, Inc. (hereafter "Treebrook"), and Defendant PJC, Inc. (hereafter "PJC"). (Complaint Para. 2, Para. 3; Answer Para. 2, Para. 3).

3. G2S Bridgewater, Treebrook, and PJC are corporations organized under the laws of the State of New Hampshire, and each has its principal place of business in New Hampshire. (Complaint Para. 3; Answer Para. 3).

4. Defendant Paul J. Cavicchi is a citizen and resident of the State of New Hampshire. (Trial Transcript (hereafter "Tr.") at 380).

5. The amount in controversy in this action exceeds $10,000, exclusive of interest and costs. (Complaint Para. 5; Answer Para. 5).

### B. Background Facts

6. Bridgewater Steam was formed to develop, construct, own, and operate a wood-fired electric generating facility in Bridgewater, New Hampshire (hereafter "the Facility"). (Tr. at 383).

7. Treebrook is owned by Roger and Peter Bloomfield, who also own the engineering firm of Bloomfield Associates, P.C. (hereafter "Bloomfield Associates"). (Tr. at 500; Plaintiff's Exhibit (hereafter "PX") 12).

8. G2S Bridgewater is owned by G2S Constructors, Inc. (hereafter "G2S Constructors"), a construction company. (Tr. at 513; PX 12).

9. Bridgewater Steam originally planned for Bloomfield Associates to design the Facility and for G2S Constructors to build the Facility. (Tr. at 519).

10. According to a general rate structure established by the New Hampshire Public Utilities Commission (hereafter "NHPUC"), an energy supplier's long-term rate structure depended on whether the energy supplier generated power before September 1 of a given year. (Tr. at 383; Defendants' Exhibit (hereafter "DX") 3, at 25).

11. On April 5, 1985, Bridgewater Steam applied to the NHPUC for a rate order, which the NHPUC approved on June 5, 1985. (Tr. at 383–84; DXs 4, 5).

12. Bridgewater Steam anticipated that construction of the Facility would take fourteen months and believed that to enable the Facility to generate power before September 1, 1987, the money to construct the Facility needed to be available and the construction of the Facility begun by July 1, 1986. (Tr. at 385; PX 12, at 3).

13. Bridgewater Steam recognized the need for an investment banker to assist it in finding money for the construction and operation of the Facility. (Tr. at 385, 500–01).

14. Bridgewater Steam wanted to engage an investment banker that would identify and contact potential sources of money, would solicit interested sources of money, and would assist Bridgewater Steam in negotiating to obtain the necessary money for the construction and operation of the Facility. (Tr. at 385, 388–89, 500–01).

15. In June 1985, Bridgewater Steam discussed with employees of the Turbodyne Division of Dresser Industries, Inc. (hereafter "Turbodyne") the possibility of purchasing from Turbodyne a turbine for the Facility. (Jenkins Deposition (hereafter "Depo.") at 23–26; PXs 1, 3).

16. As a result of the discussions between Bridgewater Steam and Turbodyne, Bridgewater Steam and Turbodyne on July 12, 1985, agreed that Turbodyne would introduce Bridgewater Steam to NCNB and, in exchange, that Bridgewater Steam would purchase a Turbodyne turbine for the Facility if:

1. Turbodyne could meet the lowest price of any other domestic supplier and deliver the turbine in compliance with Bridgewater Steam's project schedule; and

2. Bridgewater Steam obtained financing for the Facility before July 1, 1986, through the efforts of Turbodyne or NCNB.

(Tr. at 386–87; Swett Depo. at 43–44; Jenkins Depo. at 23–26; PXs 1, 3).

### C. Bridgewater Steam's Relationship with NCNB

#### 1. The Introduction of Bridgewater Steam to NCNB

17. In late June 1985, Cavicchi of PJC, Darrell Jenkins of G2S Bridgewater, and

John Kadas of Turbodyne met with J. Robert Sheppard, Jr., an assistant vice-president of NCNB, and W.W. Walker, Jr., a senior vice-president of NCNB, to discuss the possibility of engaging NCNB as a financial advisor. (Tr. at 43, 289–90, 387; Jenkins Depo. at 24).

18. At the June 1985 meeting, Sheppard informed Cavicchi and Jenkins that NCNB had experience with steam-fired facilities and with electrical generation in the project finance market, but did not mention whether NCNB would require a retainer for its services. (Tr. at 387–88).

### 2. Background Facts Regarding Project Financing and Investment Banking

19. In a project finance transaction, an entity solicits debt and equity financing on a specific project and obtains financing from a source that provides funds to the project on the basis of the security provided by the anticipated success of the project, by the specific project's assets, and by the existing contracts for the construction of the project and for the sale of the specific project's output. (Tr. at 27, 286).

20. NCNB successfully has arranged project financing for ten alternative energy projects and has acquired financing totalling in excess of $500 million. (Tr. at 288).

21. In locating potential sources of financing, NCNB uses contacts in various financial institutions from whom NCNB learns the identities of entities active in the project financing market and refers to its own files maintained for identifying potential sources of financing. (Tr. at 288–89).

22. In the investment banking arena, for an entity to obtain financing, the entity must receive a commitment for the financing. (Tr. at 79).

23. In the investment banking field, the entity who actually provides the financing is the entity that bears, or will bear, the credit risk. (Tr. at 80).

24. In the investment banking arena, for an entity to receive funding, the entity must have a successful closing of financing resulting in money changing hands, that is, the entity actually must receive financing and also actually must receive funds for the project. (Tr. at 84–85, 191, 194–95).

25. In the investment banking field, it is customary, although not compulsory, for investment bankers to receive retainers for their services. (Tr. at 294).

### 3. The Establishment of a Relationship Between NCNB and Bridgewater Steam

26. Shortly after the June 1985 meeting between Bridgewater Steam, Turbodyne, and NCNB, Kadas of Turbodyne questioned Walker about NCNB's intent to pursue Bridgewater Steam as a client. (Tr. at 293).

27. Walker informed Kadas that NCNB intended to pursue Bridgewater Steam, seek a retainer, and charge an investment banking fee. (Tr. at 293).

28. Kadas volunteered Turbodyne to pay any retainer for Bridgewater Steam. (Tr. at 293).

29. On July 1, 1985, Sheppard wrote Cavicchi a letter (hereafter "the Engagement Letter") that provided as follows:

Mr. Paul J. Cavicchi

Partner and General Manager

Bridgewater Steam Power Co.

RFD #3, Box 188

Laconia, NH 03246

Dear Paul:

NCNB National Bank of North Carolina (NCNB) proposes to act as financial advisor to Bridgewater Steam Power Company (Bridgewater) with respect to developing and financing a wood-fired electric energy generating facility to be located in Bridgewater, N.H. More specifically, our service will include the following:

Financial and factual analysis of the proposed facility,

Development of proforma financial statements and cash flow projections,

Determination of an appropriate legal and financial structure for the project,

Formulation of the business and financial plan to be presented to potential financing sources,

Arrangement, on a best efforts basis, of the financing necessary to construct and operate the facility.

As compensation for our services NCNB will be paid a fee equal to 1.5% of the amount of the financing, in whatever form, arranged by us for the project. Payment of this percentage fee will be contingent upon the successful closing of the financing and will be payable at closing.

This agreement between Bridgewater and NCNB will be in effect on an exclusive basis for a period of six months from the date of acceptance of this letter and will continue in effect thereafter unless terminated in writing by either party. Thus the fees specified in this letter will be payable if, during the period this agreement is in effect, Bridgewater, or any partner in Bridgewater, or any entity promoted by [sic] controlled by, or affiliated with Bridgewater, obtains financing for the construction, operation, or purchase of the proposed generating facility. Similarly, the fees specified in this letter will be payable if, during a period within twelve months after the termination of this agreement, Bridgewater, or any partner in Bridgewater [sic] or an entity promoted by, controlled by, or affiliated with Bridgewater, obtains funding for the construction, operation, or purchase of the generating facility from any parties whom we approached on your behalf.

The financing arranged by us will be on a "best efforts" basis and not on an underwriting basis as is the custom for public offerings. In acting as your financial advisor, we do not guarantee that you will obtain funding or that you will obtain funding on specific terms. However, we agree to use our best efforts legally to achieve your financing objectives.

If you find this proposal to be acceptable, I would appreciate your signing the enclosed copy of this letter and returning it to me. If you have any questions or wish to discuss any aspects of the arrangement, please give me a call.

Sincerely,

/s/

J. Robert Sheppard, Jr.

Assistant Vice President

Agreed to and accepted this the ___ day of _____, 1985.

BRIDGEWATER STEAM POWER COMPANY

By: _____

Paul J. Cavicchi

Partner and General Manager

(Complaint, Exhibit A; PX 5).

30. In drafting the provisions of the Engagement Letter and in sending the Engagement Letter to Bridgewater Steam, Sheppard hoped that Bridgewater Steam would employ NCNB as a financial advisor. (Tr. at 168).

31. On July 1, 1985, Sheppard also wrote Turbodyne a letter in which he advised Turbodyne that NCNB had proposed to act as a financial advisor for Bridgewater Steam. Sheppard also proposed that in consideration for NCNB's acting as financial advisor to Bridgewater Steam, Turbodyne would agree to pay NCNB a $15,000 retainer fee of three $5,000 payments and to reimburse NCNB for its out-of-pocket expenses incurred by NCNB while acting as a financial advisor to Bridgewater Steam. (Tr. at 232, PX 2).

32. Upon the request of Turbodyne, NCNB did not inform Bridgewater Steam of NCNB's proposal to Turbodyne. (Tr. 53, 232–33, 294–95).

33. On August 2, 1985, Bridgewater Steam decided to accept NCNB's proposal to act as Bridgewater Steam's financial advisor and authorized Cavicchi to accept NCNB's proposal to act as Bridgewater Steam's financial advisor. (Tr. at 388–89; PX 4).

34. Bridgewater Steam decided to engage NCNB because of NCNB's experience in financing alternative energy projects and because of NCNB's lack of interest in obtaining an equity interest in the Facility. (Swett Depo. at 45; PX 4).

35. On August 2, 1985, Cavicchi signed and dated the acceptance provision of the

Engagement Letter originally provided by NCNB. (Tr. at 389; PX 5).

36. On August 5, 1985, Turbodyne accepted NCNB's July 1, 1985 proposal and, pursuant to the terms of the proposal, thereafter made three payments of $5,000 each to NCNB, totalling $15,000. (Tr. 234–36; PX 2; DXs 15, 17, 18).

37. On August 7, 1985, Cavicchi mailed to NCNB the signed copy of the Engagement Letter from New Hampshire. (Tr. at 389; DX 16).

D. Activities Following the Execution of the Engagement Letter

38. In fulfilling its duties under the Engagement Letter, NCNB advised Bridgewater Steam of the need to purchase the boiler and turbine for the Facility from recognized and credible suppliers and of the need to avoid unknown suppliers having balance sheets calling into question the supplier's ability to honor its guarantees. (Tr. at 172–73).

39. Under the terms of the Engagement Letter, in soliciting financing for the Facility, NCNB was required to prepare, among other things, a prospectus or placement memorandum (hereafter "Placement Memorandum") for distribution to potential financing sources. (Tr. at 63; PX 5).

40. On August 14, 1985, at Cavicchi's request, Sheppard wrote a letter to Mr. Willard Martin, of the firm of Nighswander, Martin, & Mitchell, P.A. in Laconia, New Hampshire, and sent a copy of the letter to Cavicchi. (DX 19).

41. In his August 14, 1985 letter, Sheppard indicated NCNB's ability immediately to begin the process of arranging financing for the Facility. (DX 19).

42. Sheppard prefaced his remark regarding NCNB's ability, however, on the approval of Bridgewater Steam's zoning request to construct the Facility, which the Zoning Board of Adjustment had denied in June 1985. (Tr. at 437; DX 19).

43. In his August 14, 1985 letter to Martin, Sheppard estimated the time necessary for arranging financing for the Facility. (DX 19).

44. According to Sheppard's estimates, three to four weeks would be necessary for potential lenders to review the Placement Memorandum provided by NCNB; one additional week for NCNB to review submitted proposals, to discuss the proposals with Bridgewater Steam, and to select a lender; three to four weeks for NCNB to negotiate with the lender and to receive final approval from the lender's loan committee; and six to eight weeks for NCNB to negotiate the necessary documents to close the transaction. (DX 19).

45. Sheppard anticipated being able to close the financing transaction for the Facility by the end of December 1985, but Sheppard conditioned his estimates on the distribution of the Placement Memorandum by the end of August 1985. (DX 19).

46. NCNB, however, did not proceed to prepare a Placement Memorandum or begin to solicit financing for the Facility by the end of August 1985. (Tr. at 212).

47. NCNB justified its delay in proceeding on the existence of the zoning dispute and believed that before soliciting project financing for the Facility, the zoning dispute needed to be resolved. (Tr. at 88–89).

48. On December 6, 1985, the NHPUC ruled in Bridgewater Steam's favor on the zoning dispute, which ruling subsequently was appealed to the New Hampshire Supreme Court. (Tr. at 89, 213, 403).

49. As of December 6, 1985, NCNB had not yet prepared the Placement Memorandum. (Tr. at 214, 217).

50. Sheppard reasoned that to have prepared the Placement Memorandum during the fall of 1985 before the resolution of the zoning dispute would not have been an efficient use of NCNB's time. (Tr. at 212).

51. After the NHPUC's December 6, 1985 ruling, NCNB did not distribute immediately the Placement Memorandum or solicit financing for the Facility on the grounds that potential financiers would not give proper attention to any proposal so close to the end of the 1985 calendar year. (Tr. at 215, 326–27).

52. Shortly after the beginning of 1986, the partners of Bridgewater Steam began

to dispute the selection of the Facility's design engineer, who was Bloomfield Associates, and the Facility's general contractor, who was G2S Constructors. (Tr. at 437–39).

53. Because of the disputes between Bloomfield Associates and G2S Constructors, NCNB delayed its solicitation of financing for the Facility. (Tr. at 98–101).

54. NCNB and Bridgewater Steam subsequently conferred and agreed on the following timetable for NCNB's activities in attempting to obtain financing for Bridgewater Steam: (1) By January 24, 1986, NCNB would send a draft of the Placement Memorandum (hereafter "Draft Placement Memorandum") to Cavicchi; (2) during the weeks of January 20, 1986, and January 27, 1986, NCNB would contact potential investors by telephone; (3) during the first two weeks of February 1986, NCNB would visit potential investors; and (4) during the third week of February 1986, NCNB would distribute the Placement Memorandum. (Tr. at 223–24; DX 20).

55. On January 24, 1986, Sheppard sent the Draft Placement Memorandum to Cavicchi for his review. (Tr. at 104–05, 217; DXs 22, 23).

56. The Draft Placement Memorandum identified one of the general partners of Bridgewater Steam as G2S Constructors, rather than as G2S Bridgewater. (Tr. at 221; DX 23 at 2).

57. The Draft Placement Memorandum named several manufacturers as possible suppliers for the Facility's turbine and boiler, two major pieces of equipment essential to the operation of the Facility. (DX 23 at 5).

58. The Draft Placement Memorandum did not contain an itemization of the working capital needs, a list of the maintenance or capital costs, a discussion of the risk posed by the poor credit rating of Public Service of New Hampshire (hereafter "Public Service"), financial statements for Bridgewater Steam, an analysis of any financial statements, or any exhibits. (Tr. at 394–95; DX 23).

59. Sometime in January 1986 or early February 1986, Cavicchi met with Sheppard and Walker of NCNB in Charlotte, North Carolina. (Tr. at 396).

60. During this meeting in Charlotte, Cavicchi informed Sheppard and Walker of recent developments concerning the purchase of a turbine for the Facility, including the competitive nature of the bids by General Electric Company (hereafter "GE") and Turbodyne and the possibility of Bridgewater Steam's purchase of a GE turbine. (Tr. at 397).

61. In response to Cavicchi's statements, Walker simply suggested to Cavicchi that Bridgewater Steam place the turbine order with Turbodyne. (Tr. at 397).

62. Cavicchi failed to give any significance to Walker's suggestion, but mentioned that Bridgewater Steam would make its purchase decision based on the best interests of the Facility. (Tr. at 397).

63. As of the meeting in Charlotte, Cavicchi still did not know of NCNB's agreement with Turbodyne. (Tr. at 397–98).

64. On February 2, 1986, the six-month period provided in the Engagement Letter requiring NCNB to be Bridgewater Steam's exclusive financial advisor expired. (PX 5).

65. On February 11, 1986, Bridgewater Steam voted to notify NCNB that NCNB no longer would have exclusive financing rights for the Facility. (Tr. at 398–99; PX 8).

66. Cavicchi subsequently telephoned Sheppard to notify him of Bridgewater Steam's vote and desire no longer to allow NCNB exclusive financing rights for the Facility. (Tr. at 399).

67. During the telephone conversation, Sheppard told Cavicchi that NCNB would not represent Bridgewater Steam unless NCNB was the sole financial advisor for the Facility and asked Cavicchi for an opportunity to meet with Bridgewater Steam before Bridgewater Steam sent NCNB a formal notice of termination of its services. (Tr. at 109–10, 225–26, 399).

68. Pursuant to Sheppard's request, on March 4, 1986, Sheppard met with Cavicchi

of PJC, Jenkins and Phillip Swett of G2S Bridgewater, and Peter Bloomfield of Treebrook. (Tr. at 110–11).

69. Meanwhile, on February 21, 1986, Bridgewater Steam placed an order with Turbodyne for the purchase of the turbine for the Facility. (Tr. 406; PX 21).

70. Also, in the latter part of February 1986, Cavicchi became acquainted with Mr. Ted Mason, who informed Cavicchi that he, Mason, knew of someone who might be interested in financing the Facility. (Tr. at 406).

71. Mason requested a fee for bringing together Bridgewater Steam and the potential financing source. (Tr. at 406).

72. Cavicchi refused Mason's request for a fee. (Tr. at 406–07, 458).

73. Because of Mason's contact, Cavicchi and Swett of Bridgewater Steam thereafter met with two representatives of Community Energy Alternative, Inc. (hereafter "CEA"): Mr. Arthur Nislick, the president, and Mr. Andre Simone, the vice-president. (Tr. at 407–08; Simone Depo. at 28–29).

74. Simone and Nislick met with Cavicchi and Swett to discuss the Facility; to learn about the Facility's status, technical configuration, source of fuel, and distribution of output; and to receive documents to review. (Tr. at 407–08; Simone Depo. at 28–29).

75. In anticipation of the scheduled March 4, 1986 meeting with NCNB, Cavicchi, Jenkins, Swett, and Peter Bloomfield met on March 3, 1986, to review alternatives available to Bridgewater Steam if Bridgewater Steam voted to terminate NCNB. (Tr. at 399; PX 10).

76. At the March 3, 1986 meeting, Bridgewater Steam recognized that three entities had expressed interest in investing in the Facility and that one lawyer was available to serve as a financial consultant. (Tr. at 399–401; PX 10).

77. During the March 4, 1986 meeting between Bridgewater Steam and NCNB, Sheppard advised Bridgewater Steam that NCNB would not continue as Bridgewater Steam's financial advisor if Bridgewater

Steam employed another financial advisor. (Tr. at 112, 226).

78. During the March 4, 1986 meeting, Sheppard also informed Bridgewater Steam that Turbodyne had paid a $15,000 retainer fee to NCNB in connection with NCNB acting as Bridgewater Steam's financial advisor. (Tr. at 398, 514).

79. At the March 4, 1986 meeting, Sheppard additionally informed Bridgewater Steam that during the week of March 10, 1986, NCNB would distribute the Placement Memorandum and that by June 30, 1986, NCNB could close the financial arrangements for the Facility's construction. (Tr. at 401; PX 11).

80. At the conclusion of the March 4, 1986 meeting, Bridgewater Steam voted unanimously to continue with NCNB as its financial advisor because of Bridgewater Steam's desire to have financing for the Facility by July 1, 1986. (Tr. 402–03, 508–09).

81. During the week of March 10, 1986, NCNB began distributing copies of the Placement Memorandum, which exceeded 200 pages, to potential financiers believed by NCNB possibly to have an interest in financing the Facility. (Tr. 248–50; PX 12; DX 29).

82. The Placement Memorandum contained a summary of the nature of the Facility, a summary of the proposed financing, reviews of the Facility's design and construction, financial projections (including projected revenues and projected expenses), assumptions in making financial projections, descriptions of the participants in the construction and operation of the Facility, and exhibits—including environmental considerations, maps, the NHPUC rate order, and selected financial statements. (Tr. at 120–29; PX 12).

83. Cavicchi asked Sheppard to mail a copy of a Placement Memorandum to CEA, whom NCNB had not identified as a potential source of financing for the Facility. (Tr. at 133–35; 259, 313, 408–09, 460).

84. Sheppard thereafter telephoned CEA's Simone to inquire about CEA's interest in receiving a copy of the Placement

Memorandum and to discuss financing for the Facility. (Tr. at 134, 259).

85. Simone was familiar with Bridgewater Steam's proposed Facility from his previous meeting with Bridgewater Steam. (Tr. at 134, 259).

86. After communicating with CEA's Simone by telephone, Sheppard mailed a copy of the Placement Memorandum to CEA on March 14, 1986. (Tr. at 133–34; DX 30).

87. During March, April, and May 1986, on its own initiative and on request from Bridgewater Steam, NCNB mailed out additional copies of the Placement Memorandum to other potential financiers, some of whose identities NCNB had discovered and some of whose identities NCNB had been advised of by Bridgewater Steam. (Tr. at 248–50, 252).

88. Over the three-month period of distribution, NCNB mailed copies of the Placement Memorandum to approximately 40 potential investors. (Tr. at 131).

89. After mailing out copies of the Placement Memorandum, NCNB never received definite responses from some potential investors. (Tr. at 256, 316).

90. In April 1986, Sheppard again telephoned Simone to discuss CEA's potential for financing the Facility. (Tr. at 139, 259).

91. During the April 1986 telephone conversation, Simone informed Sheppard that he preferred to deal directly with Bridgewater Steam and was not interested in discussing financing for the Facility with NCNB. (Tr. at 139).

92. After Sheppard's April telephone call to Simone, NCNB did not attend any meeting with CEA, did not negotiate any financing arrangements on Bridgewater Steam's behalf with CEA, and did not have any further contact with CEA. (Tr. at 148, 176, 259–60).

93. During March, April, and May 1986, Cavicchi and others from Bridgewater Steam communicated and met with CEA representatives. (Tr. at 409; Jenkins Depo. at 51–52).

94. On April 23, 1986, CEA submitted a financing proposal to Bridgewater Steam. (PX 13).

95. NCNB received a copy of CEA's financing proposal and, at Bridgewater Steam's request, reviewed, analyzed, and gave its opinion to Bridgewater Steam of CEA's financing proposal. (Tr. at 142, 144–48).

96. NCNB was available during May 1986 to assist Bridgewater Steam in its negotiations with CEA, but Bridgewater Steam limited NCNB's role. (Tr. at 307).

97. On May 20, 1986, Cavicchi, Swett, and Jenkins met with representatives of CEA and Harbert International, Inc. (hereafter "Harbert"), a construction company headquartered in Birmingham, Alabama. (Tr. 409–10, 514).

98. At the May 20, 1986 meeting, the partners of Bridgewater Steam discovered that CEA and Harbert were interested in negotiating a deal for financing the Facility. (Tr. at 515).

99. At the May 20, 1986 meeting, the participants agreed that CEA would prepare and submit to Bridgewater Steam a letter of intent. (Tr. at 410–11, 515; Swett Depo. at 77–78).

100. At the conclusion of the May 20, 1986 meeting, Bridgewater Steam did not intend to be bound to receive financing for the Facility, and CEA did not intend to be bound to provide financing for the Facility. (Tr. at 411, 515).

101. On May 27, 1986, Bridgewater Steam voted to terminate its relationship with NCNB because of dissatisfaction with NCNB's ability to obtain financing proposals. (Tr. at 413, 475–76; PX 14).

102. On May 27, 1986, Bridgewater Steam authorized Cavicchi to sign a letter of intent submitted by CEA for Bridgewater Steam to enter negotiations with CEA. (Tr. at 475; PX 14).

103. On June 2, 1986, Cavicchi wrote Sheppard and terminated Bridgewater Steam's relationship with NCNB originally created in the Engagement Letter. (Tr. at 227, 476; PX 16).

E. Events Occurring after Bridgewater Steam's Termination of NCNB

104. On June 19, 1986, CEA sent Bridgewater Steam a proposed letter of

intent (hereafter "Letter of Intent"). (PX 19).

105. The parties to the Letter of Intent were CEA, Harbert, and the Bridgewater Steam Power Developers (hereafter "Bridgewater Developers"). (PX 19).

106. The Letter of Intent provided in part as follows:

On May 20, 1986, ... Cavicchi, ... Swett, and ... Jenkins who represented the [Bridgewater] Developers and representatives of CEA/[Harbert] have come to an understanding on structuring the [Facility]. CEA and [Harbert], as General Partners, will enter into a special purpose partnership arrangement with the [Bridgewater] Developers, as limited partners, to share the responsibilities and benefits of the [Facility]. The rights, responsibilities, obligations, and final structure of the ownership arrangement of the parties will be defined in a Partnership Agreement as a separate instrument in writing.... The understanding reached between the parties listed above will form the basis upon which the Partnership Agreement is drafted and is documented herewith as follows:

[Harbert] ... and CEA ... intend to 100% equity finance the development, construction and startup of the [Facility].

.    .    .    .    .

This Letter of Intent will be superseded by a Partnership Agreement or terminate on July 16, 1986, whichever date shall occur first, unless the parties mutually agree otherwise.

The Partnership Agreement is subject to the approval by the respective Boards of Directors of CEA and [Harbert].

(PX 19).

107. Cavicchi for the Bridgewater Developers, Simone for CEA, and a representative of Harbert subsequently executed the Letter of Intent. (Tr. at 414, 479–80; PX 19).

108. On July 1, 1986, the CEA Board of Directors voted to pursue and finance the development of the Facility. (Tr. at 415).

109. In early August, Harbert solicited a line of credit from Bankers Trust Compa-

ny of Atlanta, Georgia (hereafter "Bankers Trust") for the construction of the Facility. (PX 23).

110. On August 8, 1986, Bankers Trust issued Harbert a commitment letter for a line of credit to construct the Facility. (PX 24).

111. Subsequently, on August 21, 1986, a limited partnership called Bridgewater Power Company, L.P. (hereafter "Bridgewater Power") was created under New Hampshire law, which was composed of the following partners: CEA Bridgewater, Inc. (hereafter "CEA Bridgewater"), a subsidiary of CEA, and New Hampshire Cogen, Inc. (hereafter "New Hampshire Cogen"), a subsidiary of Harbert as general partners; Treebrook and G2S Bridgewater as limited partners; and PJC as a general partner to transfer Bridgewater Steam's interconnection agreement with Public Service to Bridgewater Power and, once such transfer occurred, thereafter a limited partner. (PX 22).

112. Each of the general and limited partners executed an Agreement of Limited Partnership of Bridgewater Steam Power Company, L.P. (hereafter "Bridgewater Power Partnership Agreement"). (PX 22).

113. CEA required the partners in Bridgewater Steam to be limited partners in Bridgewater Power because of the previous disputes among Treebrook and G2S Constructors. (Tr. at 417).

114. Under the Bridgewater Power Partnership Agreement, Bridgewater Steam transferred all of its interest in the Facility to Bridgewater Power. (PX 22, at 7–8).

115. Under the Bridgewater Power Partnership Agreement, the partners of Bridgewater Steam received a one million dollar development fee. (PX 22, at 18).

116. Upon the execution of the Bridgewater Power Partnership Agreement on August 21, 1986, Cavicchi believed that funding was complete. (Tr. at 482).

117. On August 21, 1986, PJC received a bonus from the other Bridgewater Steam partners for securing long-term financing for the Facility, which bonus was in the

form of an eight percent increase in PJC's partnership interest of Bridgewater Steam. (Tr. at 485–88).

118. On September 7, 1986, the partners of Bridgewater Steam dissolved Bridgewater Steam because Treebrook, G2S Bridgewater, and PJC all were limited partners in Bridgewater Power. (Tr. at 417–18; PX 26).

119. On October 1, 1986, Bridgewater Power and Bankers Trust entered into a credit agreement (hereafter "Credit Agreement") providing Bridgewater Power with a $23.5 million line of credit. (PX 33).

120. Both CEA Bridgewater and Harbert guaranteed the line of credit to the extent of $12.5 million each. (PX 28; DX 48).

121. CEA entered into a subscription agreement obligating it to purchase $12.5 million of stock of CEA Bridgewater if Bankers Trust called upon CEA Bridgewater to honor its guaranty on the line of credit. (PX 29).

122. Public Service Enterprise Group, Inc., which is the parent corporation of CEA, entered into a subscription agreement obligating it to purchase $12.5 million of stock of CEA if CEA was required to honor its subscription agreement with CEA Bridgewater. (PX 30).

123. Swett of G2S Bridgewater believed that CEA provided the funding for the Facility. (Tr. at 519).

124. After receiving the line of credit, Bridgewater Power began construction of the Facility. (Tr. at 418).

125. During construction, Bridgewater Power cancelled the purchase of the Turbodyne turbine, for which Bridgewater Power paid a $157,000 cancellation fee, and purchased two GE turbines. (Tr. at 418).

126. The construction of the Facility eventually was completed. (Tr. at 419).

127. Mason, who had introduced Bridgewater Steam to CEA, eventually received a $60,000 fee from either CEA or Bridgewater Power. (Tr. at 458).

128. Bankers Trust has not called on Harbert or CEA Bridgewater to honor the guaranty agreements. (Tr. at 419).

## II.  CONCLUSIONS OF LAW

The Court has personal jurisdiction over all of the parties in this action. The Court also has subject matter jurisdiction over this action because diversity of citizenship exists among the parties and the amount in controversy exceeds $10,000, exclusive of interests and costs.

■ In this diversity action, the Court must apply North Carolina substantive law, including its choice of law rules. *Boone v. Aeronca, Inc.*, 669 F.Supp. 1353, 1359 (W.D.N.C.1987). In contract actions, North Carolina courts apply the law of the state in which the last act necessary to create the contract occurred. *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). The final act necessary to make a binding agreement is the acceptance of the offer, and when the offer is in the form of a letter asking that the acceptance be made by the fixing of a signature on the letter, the agreement becomes binding when the signature is made on the letter. *See Goldman v. Parkland of Dallas, Inc.*, 277 N.C. 223, 227, 176 S.E.2d 784, 787 (1970).

In this case, NCNB's Engagement Letter provided that to accept NCNB's offer to act as financial advisor, Bridgewater Steam needed to sign the Engagement Letter and return it to NCNB. Cavicchi signed the Engagement Letter in New Hampshire and mailed the signed Engagement Letter to NCNB from New Hampshire. Cavicchi, therefore, created the contract in New Hampshire. New Hampshire law, thus, controls the substantive legal issues in this dispute between NCNB and the Defendants.

This dispute between NCNB and the Defendants requires the Court to resolve the following four issues:

1. Is NCNB entitled to a fee under the Engagement Letter?

2. By entering into an agreement with Turbodyne, did NCNB breach its duty of undivided loyalty to Bridgewater Steam?

3. Because of his signature on the Engagement Letter, can Defendant Cavicchi be held individually liable to NCNB?
4. What amount, if any, is NCNB entitled to recover?

### A. Is NCNB Entitled to a Fee?

■ The Engagement Letter, which is a contract between NCNB and Bridgewater Steam, governs NCNB's entitlement to a fee. The Court, therefore, must consider the specific terms of the Engagement Letter. Under the specific terms of the Engagement Letter, NCNB was required to perform several services, including (1) to engage in a financial and factual analysis of the Facility, (2) to develop proforma financial statements and cash flow projections, (3) to determine an appropriate legal and financial structure for the project, (4) to form a business and financial plan for presentation to potential financing sources, and (5) to arrange financing for the Facility on a best efforts basis.

There appears to be little dispute that NCNB performed the first four services required under the Engagement Letter. The Defendants, however, contended that NCNB did not use its best efforts to arrange financing. To support their contention, the Defendants argued that NCNB did not act promptly, failed to identify and solicit all investors who might have been interested in financing the Facility, failed diligently to pursue lenders contacted, and failed to market the Facility as aggressively as it could have.

Under New Hampshire law, the construction of a written contract typically is a question of law. *Mast Road Grain & Building Materials Co. v. Ray Piet, Inc.*, 126 N.H. 194, 489 A.2d 143, 145 (1985); *Murphy v. Doll–Mar, Inc.*, 120 N.H. 610, 419 A.2d 1106, 1108 (1980). When the parties to a contract have failed to define a term, courts construing the contract should adopt the common meaning of the term. *Mast Road Grain*, 489 A.2d at 145; *Logic Assoc., Inc. v. Time Share Corp.*, 124 N.H. 565, 474 A.2d 1006, 1010 (1984); *see Murphy*, 419 A.2d at 1108 (determining "meaning of the contract based upon the meaning that would be attached to it by a reasonable person"). Courts should construe the contract in accordance with the parties' intent when the parties entered into the contract and should judge their intent by objective or external criteria rather than by the parties' unmanifested states of mind. *Centronics Data Computer Corp. v. Salzman*, 129 N.H. 692, 531 A.2d 348, 350 (1987); *Logic Assoc.*, 474 A.2d at 1010; *Tentindo v. Locke Lake Colony Ass'n*, 120 N.H. 593, 419 A.2d 1097, 1101 (1980). In ascertaining the parties' intent, courts may consider the parties' situation at the time of contracting, the parties' object in entering into the contract, and the contract's provisions taken as a whole. *Centronics Data*, 531 A.2d at 350.

The parties have not cited any controlling authority for the definition of the term "best efforts." One federal district court has recognized, however, that the parties to a contract may choose to include in the contract itself a definition of the term "best efforts" or the standard against which a party's performance is to be measured. *Pinnacle Books, Inc. v. Harlequin Enter.*, 519 F.Supp. 118, 121 (S.D.N.Y. 1981). Federal courts also have acknowledged that the term "best efforts" "cannot be defined in terms of a fixed formula ... [but] varies with the facts and the field of law involved" and is a "term which necessarily takes its meaning from the circumstances." *Triple–A Baseball Club Assoc. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *Bloor v. Falstaff Brewing Corp.*, 454 F.Supp. 258, 267 (S.D.N.Y.1978), *aff'd*, 601 F.2d 609 (2d Cir.1979) (quoting *Perma Research & Dev. v. Singer Co.*, 308 F.Supp. 743, 748 (S.D.N.Y.1970)); *see Pinnacle Books*, 519 F.Supp. at 121 (noting that performance required under best efforts clause may be implied from circumstances of case). In construing the term "best efforts," courts may consider a party's experience, expertise, financial status, opportunities, and other abilities. *See Triple–A Baseball Club Assoc. v. Northeastern Baseball, Inc.*, 655 F.Supp. 513, 540 (D.Me.), *aff'd in part, rev'd in part, and*

*remanded,* 832 F.2d 214 (1st Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *Bloor,* 454 F.Supp. at 267. The requirement that a party use its best efforts necessarily does not prevent the party from giving reasonable consideration to its own interests. *Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609, 614 (2d Cir.1979). One federal district court has recognized, however, that a duty to exercise best efforts ordinarily requires a party to perform "in good faith and to the extent of its own total capabilities." *Bloor,* 454 F.Supp. at 267.

Federal courts have found a breach of a contractual "best efforts" provision when one party has ceased performance altogether and when a party has engaged in numerous misfeasances or nonfeasances. *United Roasters, Inc. v. Colgate–Palmolive Co.,* 649 F.2d 985, 990 (4th Cir.) (finding breach upon cessation of performance), *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981); *Bloor,* 601 F.2d at 614 (finding breach upon commission of numerous misfeasances or nonfeasances). Another court, however, has found no breach of a "best efforts" clause when one party encountered difficult problems in carrying out the terms of the contract. *Western Geophysical Co. v. Bolt Assoc.,* 584 F.2d 1164, 1171–72 (2d Cir.1978).

In the case before the Court, the parties failed to define the term "best efforts" in the Engagement Letter and failed to establish the standard against which to measure NCNB's performance. The Court, however, believes that because Bridgewater Steam's goal in engaging NCNB, and NCNB's goal in accepting Bridgewater Steam as a client, was to obtain financing for the construction and development of the Facility, the meaning of the term "best efforts" can be determined from the circumstances.

Having reviewed the evidence introduced at trial, the Court believes that based on its experience, expertise, financial status, opportunities, and other abilities, NCNB performed its services in good faith and exercised its best efforts to arrange financing for the Facility. Although the Defendants at times were disappointed in NCNB's performance, the Defendants' disappointment should not automatically bar NCNB's recovery of its fee. Because Bridgewater Steam was seeking project financing, its ability to obtain financing directly related to the anticipated success of the project, the specific project's assets, and the existing contracts for the construction of the project and for the sale of the specific project's output. During the fall of 1985 and the winter of 1986, NCNB decided to delay on several occasions the publication and distribution of the Placement Memorandum. Based on its experience, NCNB believed that Bridgewater Steam's ability to obtain financing would be strengthened by the resolution of several problems and, therefore, justified the delays because of the existence of a zoning dispute and related litigation, the end of the 1985 calendar year, a dispute between the partners which eventually resulted in litigation among them, and the failure of Bridgewater Steam to select definitively its major suppliers. The facts clearly reveal that NCNB did not cease its performance, but encountered some difficulties and delayed part of its performance for rational and plausible reasons.

Bridgewater Steam and NCNB met and agreed on a schedule for the publication and distribution of the Placement Memorandum and the solicitation of financing, despite the fact that some of the problems had not been completely resolved. Based upon the information in its possession, NCNB subsequently distributed the Placement Memorandum to financing sources and solicited financing sources known to NCNB to be active in the project financing market. NCNB was available to assist Bridgewater Steam with arranging the financing and negotiating with CEA. At Bridgewater Steam's request, NCNB in fact reviewed, analyzed, and gave its opinion to Bridgewater Steam of CEA's April 1986 financing proposal. Thereafter, in May 1986, NCNB remained available to assist Bridgewater Steam in its negotiations with CEA. CEA and Bridgewater Steam, however, limited NCNB's role in the negotiations. Based on all of the evidence

introduced at trial, the Court concludes that NCNB performed all of the services required in the Engagement Letter, including the exercise of its best efforts to arrange financing for Bridgewater Steam.

Having concluded that NCNB performed the services required under the Engagement Letter, the Court next must consider the specific terms of the Engagement Letter to determine whether NCNB is entitled to a fee. The terms of the Engagement Letter classify NCNB's entitlement to a fee upon whether the agreement between NCNB and Bridgewater Steam was in effect. Under the Engagement Letter, NCNB is entitled to a fee if, before the termination of the relationship between Bridgewater Steam and NCNB, "Bridgewater [Steam], or any partner in Bridgewater [Steam], or any entity promoted by [sic] controlled by, or affiliated with Bridgewater [Steam], obtains financing for the construction, operation, or purchase of the proposed generating facility." (PX 5).

NCNB argued principally that Bridgewater Steam, a partner in Bridgewater Steam, or an entity promoted by, controlled by, or affiliated with Bridgewater Steam obtained financing for the Facility before Bridgewater Steam terminated its relationship with NCNB. The Defendants contended, however, that financing was not obtained while NCNB was Bridgewater Steam's financial advisor. The Defendants contended, also, that even if financing was obtained, it was not obtained by Bridgewater Steam, a partner of Bridgewater Steam, or an entity promoted by, controlled by, or affiliated with Bridgewater Steam.

Having reviewed the evidence and the applicable law, the Court concludes that while the agreement between NCNB and Bridgewater Steam was in effect, neither Bridgewater Steam, nor any partner of Bridgewater Steam, nor any entity promoted by, controlled by, or affiliated with Bridgewater Steam obtained financing for the Facility. Bridgewater Steam terminated its relationship with NCNB on June 2, 1986. According to the testimony at trial, for an entity to obtain financing, the entity actually must receive a commitment for financing. Webster's New Lexicon Dictionary defines the term "obtain" to mean to become the possessor of or to secure for oneself. Webster's Dictionary, The New Lexicon of the English Language, 693 (1989). As of June 2, 1986, no source of financing had committed to provide financing to Bridgewater Steam, any partner of Bridgewater Steam, or any entity promoted by, controlled by, or affiliated with Bridgewater Steam. Moreover, neither Bridgewater Steam nor any partner of Bridgewater Steam nor any entity promoted by, controlled by, or affiliated with Bridgewater Steam had secured a financing commitment by June 2, 1986.

The discussions occurring at the May 20, 1986 meeting between the partners of Bridgewater Steam, CEA, and Harbert eventually resulted in the financing of the Facility. At the May 20, 1986 meeting, however, the participants agreed only that CEA would prepare and submit to Bridgewater Steam a Letter of Intent. At the conclusion of the May 20, 1986 meeting, Bridgewater Steam did not intend to be bound to receive financing for the Facility. Therefore, neither Bridgewater Steam nor any partner of Bridgewater Steam nor any entity promoted by, controlled by, or affiliated with Bridgewater Steam secured a commitment for financing at the May 20, 1986 meeting or at any time before June 2, 1986. Further, CEA did not intend to be bound to provide financing for the Facility. Neither CEA nor Harbert, therefore, committed to financing the Facility at the May 20, 1986 meeting or at any time before June 2, 1986. Because neither Bridgewater Steam nor any partner of Bridgewater Steam nor any entity promoted by, controlled by, or affiliated with Bridgewater Steam obtained financing before June 2, 1986, NCNB is not entitled to compensation under the Engagement Letter for events occurring before the termination of the relationship between Bridgewater Steam and NCNB.

Under the Engagement Letter, NCNB also is entitled to a fee if, within twelve months after the termination of the relationship between Bridgewater Steam

and NCNB, "Bridgewater [Steam], or any partner in Bridgewater [Steam], or an entity promoted by, controlled by, or affiliated with Bridgewater [Steam], obtains funding for the construction, operation, or purchase of the generating facility from any parties whom [NCNB] approached on [Bridgewater Steam's] behalf." (PX 5). Under this provision of the Engagement Letter, NCNB would be entitled to its fee if each of the following requirements were met:

1. Funding was obtained within twelve months after Bridgewater Steam terminated its relationship with NCNB;

2. The entity obtaining funding for the construction, operation, or purchase of the Facility was Bridgewater Steam, any partner in Bridgewater Steam, or an entity promoted by, controlled by, or affiliated with Bridgewater Steam; and

3. The funding for the Facility was obtained from a party approached by NCNB on Bridgewater Steam's behalf.

NCNB argued that each of these three requirements were satisfied and, therefore, that it is entitled to its fee. The Defendants, however, argued primarily that Bridgewater Power, as the entity receiving the funding, was neither Bridgewater Steam nor a partner in Bridgewater Steam nor an entity promoted by, controlled by, or affiliated with Bridgewater Steam. The Defendants contended, also, that the funding—the $23.5 million line of credit—was not obtained from a party approached by NCNB.

The Court concludes that funding was obtained within twelve months after Bridgewater Steam terminated its relationship with NCNB. The term "funding" is not synonymous with the term "financing," but is a term signifying a successful closing of the financing resulting in the party seeking financing actually receiving financing and funds for the project. On August 21, 1986, the partners of Bridgewater Steam, CEA Bridgewater, and New Hampshire Cogen executed the Bridgewater Power Partnership Agreement. On October 1, 1986, funding for the Facility was obtained by virtue of the $23.5 million line of credit extended by Bankers Trust.

Thus, funding in the amount of $23.5 million was obtained within twelve months of Bridgewater Steam's termination of its relationship with NCNB.

The Court concludes that the entity obtaining funding for the Facility was in fact an entity promoted by, controlled by, or affiliated with Bridgewater Steam. According to the Bridgewater Power Partnership Agreement, Bridgewater Power was the entity that received funding for the construction and operation of the Facility. Bridgewater Power clearly is neither the same entity as Bridgewater Steam nor a partner of Bridgewater Steam.

The Court concludes, however, that Bridgewater Power is an entity promoted by Bridgewater Steam. Webster's New Lexicon Dictionary defines the term "promote" to mean to help forward, to further, or to encourage. Webster's Dictionary, The New Lexicon of the English Language, 800 (1989). Initially, to explore the possibility of alternative financing, Cavicchi and Swett of Bridgewater Steam approached CEA. Thereafter, representatives of Bridgewater Steam on several occasions met with, and discussed the Facility with, representatives of CEA. Representatives of Bridgewater Steam, CEA, and Harbert met and discussed the creation of a partnership that eventually produced the financing necessary for the construction and operation of the Facility. CEA, Harbert, and Bridgewater Steam executed a Letter of Intent to memorialize an understanding reached regarding the formation of a special partnership for the development of the Facility. A subsidiary of CEA, a subsidiary of Harbert, and the partners of Bridgewater Steam subsequently created Bridgewater Power. These facts undoubtedly demonstrate that although Bridgewater Steam may not have originated the concept or structure of Bridgewater Power, Bridgewater Steam furthered or encouraged the formation of Bridgewater Power.

Having concluded that Bridgewater Power was promoted by Bridgewater Steam, the Court need not examine in detail whether Bridgewater Power was an entity controlled by or affiliated with Bridgewater

Steam. For the record, however, the Court has concluded that Bridgewater Power was neither an entity affiliated with Bridgewater Steam [1] nor an entity controlled by Bridgewater Steam. [2]

The Court concludes, further, that the funding for the Facility was obtained from a party approached by NCNB on Bridgewater Steam's behalf. To reach this conclusion, the Court must consider the meaning of two terms contained in the Engagement Letter: the term "funding" and the term "approached."

The Court, first, will examine the meaning of the term "funding." According to the uncontested evidence at trial, in the investment banking arena, the term "funding" means a successful closing of the financing and the receipt of money by the developers, and the entity providing the funding is the entity taking the credit risk. Because of security agreements and subscription agreements executed by them, CEA and Harbert took the credit risk for the line of credit supplied by Bankers Trust. Moreover, CEA and Harbert each contributed capital for the development of the Facility. CEA and Harbert, therefore, provided the funding for the Facility, although Bankers Trust supplied most of the actual money under the line of credit. Further, at trial, Swett testified that CEA provided the funding for the project. At trial, additionally, Cavicchi testified that funding was complete on August 21, 1986, upon the execution of the Bridgewater Power Partnership Agreement. The Court believes, therefore, that in the investment banking arena, the common meaning of the term "funding" requires a finding that Bridgewater Power, an entity promoted by Bridgewater Steam, obtained funding from CEA and Harbert.

The Court, next, will consider the meaning of the term "approached." The Defendants contended essentially that the Court should construe the term "approached" to require NCNB to be the first to contact a potential source of financing and inform the source of the project. NCNB, on the other hand, contended that the Court should construe the term "approach" to require NCNB merely to communicate with a potential source of financing. Webster's New Lexicon Dictionary defines the term "approach" to mean to address oneself to. Webster's Dictionary, The New Lexicon of the English Language, 45 (1989). Webster's New Lexicon Dictionary defines the term "address" to mean to speak or write formally to or to turn to. *Id.* at 10. The Court believes that the common meaning of the term "approach" is the meaning urged by NCNB and, therefore, that the term "approached" should be construed in line with the construction urged by NCNB. The evidence introduced at trial established that after Cavicchi discovered CEA's possible interest in financing the Facility and informed NCNB of CEA's possible interest, NCNB communicated with CEA on at least three occasions. In March 1986, Sheppard telephoned Simone to inquire of CEA's interest in receiving a copy of the Placement Memorandum prepared by NCNB and to discuss financing for the Facility. On March 14, 1986, Sheppard mailed a copy of the Placement Memorandum to CEA. And, in April 1986, Sheppard telephoned Simone to discuss CEA's potential for financing the Facility. From these facts, the Court concludes that although Cavicchi first contacted CEA about financing the Facility,

1. Webster's New Lexicon Dictionary defines the term "affiliate" to mean to enter into an association. Webster's Dictionary, The New Lexicon of the English Language, 13 (1989). Webster's New Lexicon Dictionary defines the term "association" to mean a business relationship or an organized body of people with a common interest or object. *Id.* at 56. Bridgewater Steam did not enter into any business relationship with the entity known as Bridgewater Power, although the individual partners of Bridgewater Steam entered into a business relationship with Bridgewater Power.

2. Because Bridgewater Steam actually was not a partner in Bridgewater Power, Bridgewater Steam could not exercise control over Bridgewater Power. Because the partners of Bridgewater Steam were limited partners in Bridgewater Power, Bridgewater Power was not controlled by Bridgewater Steam or the partners of Bridgewater Steam, if it could be argued that the partners of Bridgewater Steam controlled Bridgewater Power.

NCNB communicated, and therefore approached, CEA on Bridgewater Steam's behalf.

For all of the reasons enunciated above, and summarized now, the Court is of the opinion that NCNB is entitled to its fee under the terms of the Engagement Letter. First, NCNB performed its obligations required in the Engagement Letter. Second, funding was obtained within twelve months of June 2, 1986, which is the date that Bridgewater Steam terminated its relationship with NCNB. Third, the entity obtaining funding for the Facility was an entity promoted by Bridgewater Steam. And, fourth, the funding for the Facility was obtained from a party approached by NCNB on Bridgewater Steam's behalf.

### B. Did NCNB Breach its Duty of Loyalty to Bridgewater Steam?

■ The Defendants have contended that if NCNB is entitled to its fee under the Engagement Letter, NCNB breached its duty of undivided loyalty to Bridgewater Steam. To support their contention, the Defendants have argued essentially that NCNB accepted a retainer from Turbodyne to act as Bridgewater Steam's financial advisor, but failed timely to disclose fully its receipt of the retainer and to obtain Bridgewater Steam's consent and that NCNB subsequently advised Bridgewater Steam about the purchase of a turbine for the Facility. The Defendants have asserted that by breaching its duty of loyalty, NCNB should be prevented from recovering its fee.

NCNB has not argued that it did not owe Bridgewater Steam a duty of loyalty, but has argued, instead, that it did not breach its duty of loyalty. NCNB contended that when Bridgewater Steam entered into a relationship with NCNB, Bridgewater Steam already had agreed conditionally to purchase a turbine from Turbodyne and that because of Bridgewater Steam's agreement with Turbodyne, Turbodyne's interests were not adverse to the interests of Bridgewater Steam.

To support their contentions regarding the general duties owed by agents to their principals, the parties have cited New Hampshire cases involving primarily duties that real estate brokers owe their principals. Although differing factually from the case before the Court, these cases stand for well-settled agency principles and will be sufficient for purposes of the Court's decision in this case.

Under New Hampshire law, an agent is a fiduciary and owes to his principal the duty of undivided loyalty. *See Crowley v. Global Realty, Inc.,* 124 N.H. 814, 474 A.2d 1056, 1059 (1984); *Vigitron v. Ferguson,* 120 N.H. 626, 419 A.2d 1115, 1118–19 (1980); *see also* Restatement (Second) of Agency § 13 (1958) (stating that "[a]n agent is a fiduciary with respect to matters within the scope of his agency."); *id.* at § 387 (noting that "[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency."); 3 C.J.S., *Agency* § 271 (1973). An agent who has breached a duty of undivided loyalty cannot recover compensation from his principal for his services. *In re Estate of McCool,* 131 N.H. 340, 553 A.2d 761, 769 (1988); *Welch v. Coleman,* 95 N.H. 399, 64 A.2d 691, 693 (1949); *see* Restatement (Second) of Agency § 469 (1958); 3 Am.Jur.2d, *Agency* § 258 (1986). An agent ordinarily may not recover compensation for his services when the agent has acted in a dual capacity, unless the agent has fully informed his principal and has obtained the principal's consent. *Wilson v. Atwood,* 81 N.H. 61, 122 A. 797, 798 (1923).

The Court carefully has reviewed the evidence introduced at trial and has considered the applicable law. The Court concludes for several reasons that NCNB did not breach its duty of loyalty to Bridgewater Steam.

The Court believes that because Bridgewater Steam had agreed conditionally to purchase a turbine from Turbodyne before entering into a relationship with NCNB, NCNB's acceptance of a $15,000 retainer did not constitute a breach of its duty of loyalty to Bridgewater Steam. When Bridgewater Steam on August 1, 1985, accepted NCNB's offer to act as its financial

advisor, Bridgewater Steam already had agreed to purchase a turbine from Turbodyne. As of July 12, 1985, Bridgewater Steam and Turbodyne had agreed in writing that in exchange for Turbodyne's introduction of Bridgewater Steam to NCNB, Bridgewater Steam would purchase a turbine from Turbodyne if three conditions could be satisfied: First, Turbodyne could match the price of any other domestic supplier; second, Turbodyne could meet Bridgewater Steam's project schedule; and, third, Bridgewater Steam procured financing for the Facility by July 1, 1986, through the efforts of NCNB. Although conditional, Bridgewater Steam's agreement to purchase a turbine from Turbodyne essentially committed Bridgewater Steam to buy from Turbodyne.

Further, due to the agreement between Bridgewater Steam and Turbodyne, Turbodyne's interests were neither in conflict with nor adverse to Bridgewater Steam's interests. Bridgewater Steam engaged the services of NCNB to obtain financing for the construction and operation of the Facility. Pursuant to the agreement, Bridgewater Steam would deal with Turbodyne if, among other things, Bridgewater Steam received financing by July 1, 1986, through the efforts of NCNB. Because of the agreement, Turbodyne had an interest in NCNB obtaining financing for Bridgewater Steam. If Bridgewater Steam failed to obtain financing through the efforts of NCNB, Bridgewater Steam would not be required to purchase the turbine from Turbodyne. Both Bridgewater Steam and Turbodyne, consequently, were attempting to achieve the same objective—the receipt by Bridgewater Steam of financing.

Moreover, upon NCNB's engagement by Bridgewater Steam, Turbodyne paid a retainer to NCNB on behalf of, and to benefit, Bridgewater Steam. It is customary for investment bankers to seek a retainer upon engagement by a client. When Turbodyne questioned NCNB about NCNB's intent in seeking Bridgewater Steam as a client and NCNB informed Turbodyne that NCNB would offer to advise Bridgewater Steam for a retainer and a fee, Turbodyne volunteered to pay the retainer. Turbo-

dyne, thus, effectively was paying the retainer on Bridgewater Steam's behalf.

For all of these reasons, the Court is of the opinion that NCNB did not breach its duty of loyalty to Bridgewater Steam.

### C. Can Defendant Cavicchi be Held Individually Liable to NCNB?

NCNB also attempted to impose liability on Cavicchi individually under the theory of partner by estoppel, as provided in New Hampshire statutory law. NCNB argued that because of Cavicchi's representation to be a partner in Bridgewater Steam, because of his signature on the Engagement Letter as "Partner and General Manager," and because of NCNB's reliance on Cavicchi's representations, Cavicchi should be estopped from denying individual liability for the fee.

Cavicchi, however, expectedly denied liability. Cavicchi argued, first, that because of his authority to act for the principal, Bridgewater Steam, and because of the disclosed nature of his principal, he is not personally liable for any payment due under the Engagement Letter. Cavicchi argued, second, that the theory of partner by estoppel is inapplicable to the facts of this case.

Under New Hampshire general agency principles, an agent who is authorized to act and who contracts on behalf of a disclosed principal is not individually a party to the contract and is not liable for a breach of the contract. *Chagnon Lumber Co. v. Patenaude*, 103 N.H. 448, 174 A.2d 415, 416 (1961); *see* 3 C.J.S., *Agency* § 365 (1973). In New Hampshire, partnership law has been codified. Section 304–A:15 of the New Hampshire Revised Statutes provides as follows:

All partners are liable:

(a) Jointly and severally for everything chargeable to the partnership under RSA 304–A:13 and RSA 304–A:14.

(b) Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract.

N.H.Rev.Stat.Ann. § 304–A:15. Section 304–A:16 of the New Hampshire Revised Statutes provides in pertinent part as follows:

> I. When a person, by words spoken or written or by conduct, represents himself ... as a partner in an existing partnership ..., he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership ...:
>
> (a) When a partnership liability results, he is liable as though he were an actual member of the partnership.

*Id.* at § 304–A:16.

The Court has reviewed carefully the evidence introduced at trial and the applicable law. The Court concludes that Cavicchi is not personally liable for the fee due under the Engagement Letter.

First, the theory of partner by estoppel, advanced by NCNB, is inapplicable to the facts of this case. The theory of partner by estoppel applies only when a person or entity extends credit to the partnership. Upon the execution of the Engagement Letter, NCNB merely entered into a contractual relationship with Bridgewater Steam that obligated Bridgewater Steam to pay NCNB a fee only if certain conditions were met. NCNB, however, did not extend credit to Bridgewater Steam by virtue of the execution of the Engagement Letter. Moreover, in the Engagement Letter drafted by NCNB, neither Bridgewater Steam nor NCNB acknowledged the existence of any debt or obligation owing to NCNB, and Bridgewater Steam did not obligate itself unconditionally to pay a specific sum of money to NCNB. Because NCNB did not extend any credit to Bridgewater Steam, NCNB cannot use the theory of partner by estoppel to prevent Cavicchi from showing that he was not a partner in Bridgewater Steam.

Second, under New Hampshire law, only the partners of Bridgewater Steam are liable for the fee due under the Engagement Letter. The undisputed evidence clearly established that the partners of Bridgewater Steam were G2S Bridgewater, Treebrook, and PJC. Cavicchi was never a partner in Bridgewater Steam. Cavicchi, therefore, is not personally liable for the fee due NCNB.

And, third, Cavicchi, as Bridgewater Steam's agent, cannot be liable for Bridgewater Steam's liability under the Engagement Letter. Bridgewater Steam had authorized Cavicchi to engage NCNB as its financial advisor. During the meeting between Sheppard and Walker of NCNB, Cavicchi of Bridgewater Steam, and Kadas of Turbodyne, it was clear to NCNB that Cavicchi was acting on behalf of Bridgewater Steam and was interested in engaging NCNB on behalf of Bridgewater Steam. Cavicchi, consequently, was an authorized agent acting for a disclosed principal and, accordingly, cannot be held liable for the liability of Bridgewater Steam, the disclosed principal.

### D. What Amount is NCNB Entitled to Recover?

The parties have failed to argue in their briefs the fees due NCNB under the Engagement Letter.

Under the terms of the Engagement Letter, the fee due NCNB was equal to "1.5% of the amount of the financing, in whatever form, arranged by" NCNB for the Facility. On October 1, 1986, an entity promoted by Bridgewater Steam received financing, in the form of a line of credit, in the amount of $23.5 million. NCNB, consequently, is entitled to a fee equal to the product of 1.5% and $23,500,000, or $352,500.

### III. SUMMARY AND ORDER OF THE COURT

Based upon the evidence introduced at trial, the Plaintiff, NCNB, has performed the services required under the terms of the Engagement Letter and is entitled to its fee. By accepting a retainer from Turbodyne, NCNB did not breach its duty of loyalty to Bridgewater Steam. Defendant Cavicchi, however, personally is not liable for the payment of the fee due NCNB. NCNB is entitled to recover jointly from Defendants Bridgewater Steam, G2S

Bridgewater, Treebrook, and PJC the sum of $352,500.

Simultaneously with the filing of this Memorandum of Decision and Order and in accordance herewith, the Court will enter a Judgment.

NOW, THEREFORE, IT IS ORDERED that (1) NCNB National Bank of North Carolina is entitled to recover jointly from Defendant Bridgewater Steam Power Company, Defendant G2S Bridgewater, Inc., Defendant Treebrook, Inc., and Defendant PJC, Inc. the sum of $352,500, with interest at the rate of 8.24% from the date of judgment computed in accordance with 28 U.S.C. § 1961; (2) NCNB National Bank of North Carolina shall have and recover nothing of Defendant Paul J. Cavicchi; and (3) Each party shall pay its, or his, own costs.